UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    )
                             )
          v.               )     Crim. No. 2:12-cr-225
                             )
TAMIKA SOMERVILLE        )

**EMERGENCY MOTION FOR COMPASSIONATE RELEASE
UNDER THE FIRST STEP ACT**

Tamika Somerville respectfully moves this Court pursuant to 18 U.S.C.
§ 3582(c)(1)(A)(i) to reduce his sentence to time served with directions that a
substantial period of his supervised release be served on home confinement and to
order his immediate release from the custody of the Bureau of Prisons pursuant to
Section 603 of the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 (2018)
(amending 18 U.S.C. § 3582(c)(1)(A)(i)). As amended by the First Step Act, the
compassionate release statute allows courts to reduce sentences for "extraordinary
and compelling" reasons. Tamika Somerville asks this Court to find that in light of
(a) the growing coronavirus pandemic, which public health experts and
policymakers recognize is especially dangerous in the confines of crowded
correctional institutions, (b) Mr. Somerville's underlying conditions of asthma and
hypertension, which place him at heightened risk of severe illness or death if he
contracts COVID-19, (c) the presence of COVID-19 at FCI Danbury, where Mr.
Somerville is an inmate, as well as that institution's failure to implement measures
to lower the risk of disease and death (as detailed in a habeas action filed yesterday
against the Warden of FCI Danbury and the Director of the Federal Bureau of

Prisons (BOP) on behalf of a class of vulnerable inmates[1]), and (d) the Bureau of Prisons' denial of his request for a reduction in his sentence, extraordinary and compelling reasons exist warranting his release to home confinement.

## I.        Procedural and Factual Background

On July 10, 2014, Tamika Somerville was sentenced to 180 months in prison and five years supervised release upon his plea of guilty to unlawful possession of a firearm, 18 U.S.C. § 922(g), and possession with intent to distribute a quantity of a mixture and substance containing a detectable amount of heroin, 21 U.S.C. § 841(a)(1) and § 841(b)(1)(C).[2] The conviction stemmed from a search warrant executed at a home where Tamika Somerville was staying on May 12, 2012. Mr. Somerville immediately advised officers of the presence of a gun inside a dresser drawer. Also seized from the dresser were approximately 150 stamp bags of heroin, weighing 4.98 grams. The 180-month mandatory minimum sentence was predicated on three prior drug convictions. As sentencing counsel explained, Mr. Somerville's criminal record and history of small-time drug sales was fueled by his own addiction; he is neither the drug kingpin nor the violent felon Congress intended to target and subject to the ACCA's severe punishment. Had Mr. Somerville not been

---

[1] *See Martinez-Brooks v. D. Easter, Warden of Federal Correctional Institutional at Danbury and Michael Carvajal, Director of the Federal Bureau of Prisons*, Case No. 3:20-cv-00569, Doc. 1 (D.Conn., Apr. 27, 2020).

[2] Tamika Somerville was born a female but identifies as a male and is receiving transgender medical services. He will be identified throughout with the pronouns he/him.  Exhibit A. The Presentence Report, sentencing transcripts and sentencing memorandum used the pronouns she and her; some of those references are retained herein.

deemed an Armed Career Criminal and so subject to a fifteen-year statutory minimum, it appears the guideline range would have been the 10-year statutory maximum. *See* PSR ¶¶22, 25-26; *See* 18 U.S.C. § 924(a)(2).

Tamika Somerville has endured unimaginable trauma from the very moment of his birth and yet continues to plan and hope for the future.  The sentencing court was moved to observe, "[t]his woman had, I think, the most pathetic childhood and early adulthood that I have ever seen." *United States v. Somerville*, Case 2:12-cr-225, Doc. 63 at 2.

Tamika Somerville was born in the State Correctional Institute at Muncy while his mother was serving a sentence. PSR ¶45. He was separated from his mother when he was just two weeks old and given to his now deceased maternal grandmother. He lived with his grandmother, a recovering heroin addict, in the Hill District section of the City of Pittsburgh until his mother was released from prison. PSR ¶¶45-46. Tamika's father died after battling bone cancer when he was about three years old. PSR ¶45. As a result of his mother's periods of incarceration, Tamika was shuttled among relatives. PSR ¶45. The time spent with his mother was defined by his mother's heroin addiction. At times, Tamika's mother left him unsupervised and without food. *Id*. In his youth, Tamika witnessed violent deaths. The first of these traumas occurred when he was 14-years old and saw his best friend stabbed to death. PSR ¶55.

This childhood trauma did not leave Tamika unscathed. We now know that exposure to violence impacts the developing brain.  Bruce D. Perry, The

Neurodevelopmental Impact of Violence in Childhood, American Psychiatric Press, Inc., Washington D.C., 221-238 (2001), https://7079168e-705a-4dc7-be05-2218087aa989.filesusr.com/ugd/aa51c7_4d25e15d83524996ada1e08d031f0ac7.pdf. Indeed, childhood adversity plays a causal role in most mental health problems in childhood (*e.g.,* conduct disorder, ADHD and oppositional defiant disorder) and in adulthood (*e.g.*, depression, anxiety disorders, eating disorders, sexual dysfunction, personality disorder, dissociative disorder, post-traumatic stress disorder and substance misuse). *See* Kessler R, McLaughlin K, Green J *et al.* Childhood adversities and adult psychopathology in the WHO World Mental Health Surveys. *Br. J. Psychiatry* 197, 378–385 (2010); Read J, Bentall R., Negative childhood experiences and mental health: theoretical, clinical and primary prevention implications. *Br. J. Psychiatry* 200, 89–91 (2012).

As a teen, Tamika was diagnosed with bipolar disorder. PSR ¶54. His current medication is working well, and he is not reporting any issues. Exhibit A. BOP Psychology Services reports identify Tamika as "committed to treatment" and offer a "good" prognosis.

Tamika Somerville also has a lengthy history of drug abuse. PSR ¶56. ECF Doc. 61 at 6-7. He began smoking marijuana at age 12 and started using Ecstasy and pills as a young adult. PSR ¶56.  When pills were unavailable, he used heroin. PSR ¶11. ECF Doc. 59 at 12; ECF Doc. 60 at 6-7. "She comes from a family where there [is] a lot of drug use and a lot of addiction." ECF Doc. 72 at 13. In fact, Tamika

is a third generation heroin addict: his mother and grandmother also struggled with addiction. Tamika has been participating in drug treatment within the BOP.

Despite the significant trauma Tamika has endured and his struggles with addiction, he has consistently strived to improve herself. He received a GED and graduated from Dean Tech's building maintenance program. PSR ¶60. Before the instant arrest, he was working in restaurant. PSR ¶60.

While incarcerated at the Allegheny County Jail pending resolution of the instant charges (May 13, 2012 through approximately July 2014), Tamika availed himself of all available classes and completed a number of self-improvement courses, including Life Skills I and II. ECF Doc. 61 at 7 (outlining course work). According to one instructor, Tamika "show[ed] dedication, drive, and a willingness to learn." Exhibit C. She "is keenly intelligent, realistic, and truthful." *Id*.

The Deputy Warden of the Allegheny County Jail took the extraordinary step of writing to her sentencing judge to report that she was "a model inmate. Tamika [was employed there] as a pod worker. Her supervisor [] reported that Ms. Somerville has proven herself in a position of trust." Exhibit C (letter dated Jan. 15, 2014). He added that she "demonstrated a considerable degree of respect for the staff members of the institution and fellow inmates alike." *Id*. One of her instructors echoed that sentiment, observing that Tamika addressed teachers and fellow students "with the utmost respect and courtesy." *Id*. During her approximately two year stay, "Ms. Somerville ha[d] not had any disciplinary action taken against her and she has never refused an assigned task." *Id*.

At the time of sentencing, Tamika's sentencing judge opined that "she's done so well at the jail and in the courses that she's taken and in her behavior… that I think she's got a good chance of making it on the outside when she does come out." ECF Doc. 72 at 17-18. He urges this Court to give him that chance now.

## II.    Tamika Somerville has satisfied any exhaustion requirement given the BOP's denial of his request for compassionate release.

The First Step Act provides in pertinent part

(1) in any case –

> (A) **the court**, upon . . . motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment** . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; …
> …

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A)(i). Thus, the statute provides the sentencing judge with jurisdiction to consider a defense motion for reduction of sentence based on extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," *or* after "the lapse of 30

days from the receipt of such a request by the warden of the defendant's

facility, whichever is earlier[.]" *Id*.

In this case, Mr. Somerville has satisfied the exhaustion requirement set

forth in the statute. Mr. Somerville submitted a request for compassionate release

to the warden on or about April 9, 2020.[3] On April 29, 2020, Mr. Somerville reported

by phone that he received the warden's denial on April 23, 2020.[4] Because Mr.

Somerville has applied for and effectively been denied relief from the Bureau of

Prisons, this matter is appropriately before this Court.[5] *See, e.g.*, *United States v.*

*Williams*, 2020 WL 1974372, at *4 (D.Conn., 2020) (exhaustion satisfied where

defendant requested compassionate release with the warden and request was

"effectively denied" given BOP criteria making clear he was ineligible); Order,

*United States v. Darryck Norris*, 3:18-cr-243, ECF Doc. 37 at 2 (D.Conn., Apr. 16,

2020) (explaining that "there is no dispute that Norris has fully exhausted his

administrative remedies," where defendant submitted request for compassionate

---

[3] Undersigned counsel submitted a request on Mr. Somerville's behalf seeking a transfer to home confinement under the provisions of the CARES Act; there has not been any response to that request to date. *See* Exhibit D.

[4] As discussed herein, Tamika Somerville reported by phone on April 29, 2020 that he is currently being held in quarantine in the facility's kitchen/cafeteria area without access to a computer and without access to paperwork. Mr. Somerville informed undersigned counsel of the warden's denial but has not been able to provide written confirmation.

[5] Counsel respectfully requests the opportunity to provide further briefing on this issue should this matter be in dispute. Importantly, however, any potential dispute over the 30-day claims processing rule is largely academic in this case: The 30-day requirement plainly authorizes this Court to grant a reduction in sentence as early as May 9, 2020.

release to warden, and defense counsel subsequently received response from BOP case manager that defendant was being denied release because he did not meet criteria, on basis of mistaken belief that he had a state detainer; "in light of the above, Mr. Norris has exhausted his administrative remedies and no further remedy is available within BOP."); *United States v. Atkinson*, 2020 WL 1904585, at *4 (D.Nev., Apr. 17, 2020) (concluding defendant exhausted his administrative remedies because he filed an application from the warden and received a generic response that did not indicate any action was being taken). Notably, at least one court in this district has similarly applied the 30-day rule flexibly. In *United States v. Almusa*, Judge Schwab exercised authority to review a compassionate release motion after only 27 days had lapsed from the submission of the request to the Warden. *See United States v. Almusa*, Crim. No. 18-0065, Doc. No. 100 at 4 (W.D. Pa. Apr. 17, 2020 (Schwab, J.) ("consider[ing] the request made by Defendant [27 days prior] and the letter he received from his case manager at the BOP Morgantown denying his request for compassionate release to be adequate evidence of exhaustion of the administrative remedies available to the Defendant.").

In evaluating Mr. Somerville's request for compassionate release, this Court should not give weight to the BOP's denial of compassionate release. Congress amended the compassionate release provision to "increas[e] the use and transparency of compassionate release." First Step Act of 2018, § 603(b), Pub. L. 115-391, 131 Stat. 5194, 5239 (Dec. 21, 2018). It was to make compassionate release

more widely available,[6] and to address the "documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants," *see United States v. Redd*, No. 1:97-cr-00006, 2020 WL 1248493, *7 (E.D. Va. Mar. 16, 2020), that Congress intervened in the compassionate release process by passing the First Step Act, a landmark piece of criminal-justice reform legislation that "amend[ed] numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration." *United States v. Rodriguez*, No. 2:03-cr-271, 2020 WL 1627331, *2 (E.D. Pa. Apr. 1, 2020) (quoting *United States v. Brown*, 411 F. Supp.3d 446, 448 (S.D. Iowa) (citing Cong. Research Serv., R45558, *The First Step Act of 2018: An Overview* 1 (2019))).

Thus, the First Step Act's amendment to § 3582(c)(1)(A) reflects the congressional aim to diminish the BOP's control over compassionate release by removing the BOP's exclusive "gatekeeper" role and permitting defendants to file sentence reduction motions directly with the sentencing court.[7]

---

[6] *See* 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Sen. Benjamin L. Cardin, co-sponsor of First Step Act) ("The bill expands compassionate release. . . and expedites compassionate release applications.").

[7] The BOP's administration of the compassionate release program has long been the subject of criticism. Although the BOP was first authorized to file compassionate release motions in 1984, it almost never did so. *United States v. Rodriguez*, No. 2:03-cr-271, 2020 WL 1627331, *2 (E.D. Pa. Apr. 1, 2020). From 1984 to 2013, an average of only 24 inmates were released each year through BOP-filed motions. *Id.* (citing *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice)). The BOP's failure was multifaceted; according to a 2013 report by the Inspector General, the BOP's "compassionate release program had been poorly managed and implemented inconsistently, . . .

This Court now has the authority to decide whether extraordinary and compelling reasons warrant a sentence reduction in this case **_without deference to any administrative agency_**. *See United States v. Winckler*, No. 13-cr-318, 2020 WL 166652 (W.D.Pa., Apr. 3, 2020) (granting compassionate release and noting that the relevant authorities "do not require the Court to defer to BOP's determination or use BOP guidance to rule on Defendant's Motion," and agreeing with defendant that "what is required under the Guidelines is intentionally different than the standards applied by the BOP, and that the reasons for those differences are sound."); *United States v. Laughlin*, No. 12-cr-30081, Doc. No. 55 at *7 (C.D.Ill. Sept. 23, 2019) (Mills, J.) (opinion granting compassionate release notwithstanding prior BOP denial of reduction in sentence, and declining to give weight to BOP Program Statement 5050.50, reasoning that "[b]ecause it must consider the Sentencing Commission policy statements, the Court cannot give any weight to a Bureau of Prisons program statement that is inconsistent with those policy

---

resulting in eligible inmates . . . not being considered for release, and terminally ill inmates dying before their requests were decided." *Id.* (quoting Dep't of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* (April 2013), at 11, *available at* https://oig.justice.gov/reports/2013/e1306.pdf). The same report found that the BOP "did not have clear standards as to when compassionate release is warranted and . . . BOP staff therefore had varied and inconsistent understandings of the circumstances that warrant consideration for compassionate release." *Id.  See also United States v. Almontes*, No. 3:05-cr-58, 2020 WL 1812713, *1 (D. Conn. Apr. 9, 2020) (Underhill, C.J.) ("It is widely acknowledged that the BOP fell short in its gatekeeper role and that, as a result, too few inmates were granted compassionate release."). Aside from the expense and inefficiency, the human costs of the BOP's stinting view of compassionate release has been documented by prisoner advocates. Human Rights Watch & Families Against Mandatory Minimums, *The Answer Is No: Too Little Compassionate Release in US Federal Prisons* (Nov. 2012).

10

statements"). This Court should exercise its jurisdiction under the First Step Act and Section 3582(c)(1)(A) and reduce Mr. Somerville's sentence.

## II.     This Court may reduce Tamika Somerville's sentence to time served and home confinement based on its own determination of extraordinary and compelling reasons.

The First Step Act grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A)(i).  Under the statute, the requirements for release are that the court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors under 18 U.S.C.§ 3553(a), and (3) ensure any reduction is consistent with applicable policy statements. Here, the Court has the authority to modify Mr. Somerville's sentence because "extraordinary and compelling reasons" are present.

### A.     Tamika Somerville's underlying medical conditions put him at higher risk for severe illness and, in light of the COVID-19 pandemic currently raging in the BOP and at FCI Danbury, where he is housed, constitute extraordinary and compelling reasons to grant compassionate release.

This Court should exercise its discretion to grant compassionate release and reduce Tamika Somerville's sentence considering that his long history of asthma, and hypertension put him at higher risk for severe illness or death. Medical records obtained from the BOP document this long history of asthma and hypertension and document that he is prescribed medications for these conditions, including an Albuterol Inhaler, which he keeps on his person. Exhibit A.

According to guidance issued by the CDC, individuals at higher risk of contracting COVID-19 – older adults and people of any age who have serious underlying medical conditions such as chronic lung disease or moderate to severe asthma, heart disease, diabetes, severe obesity, and people who are immunocompromised[8] – should take immediate preventative actions, including staying home, washing hands often, and avoiding close quarters.[9]  Such precautions are not possible in the BOP.

According to a recent analysis by the CDC, "people with chronic conditions including diabetes, lung disease and heart disease appear to be at higher risk of severe illness from COVID-19."[10]  The report revealed "78% of COVID-19 patients in the U.S. requiring admission to the intensive care unit had at least one underlying condition. And 94% of hospitalized patients who died had an underlying condition."[11]  "Among COVID-19 patients admitted to the ICU, 32% had diabetes,

---

[8] Centers for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (CDC, *People at Higher Risk for Severe Illness*) (last visited Apr. 1, 2020).

[9] Centers for Disease Control and Prevention, *What You Can Do*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/what-you-can-do.html (last visited Apr. 1, 2020).

[10] Allison Aubrey, *Who's Sickest from COVID-19?  These Conditions Tied to Increased Risk*, NPR (Mar. 31, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/31/824846243/whos-sickest-from-covid-19-these-conditions-tied-to-increased-risk ("Aubrey, *Who's Sickest from COVID-19?*").

[11] Aubrey, *Who's Sickest From COVID-19?*

29% had heart disease and 21% had chronic lung disease, which includes asthma,

COPD and emphysema. In addition, 37% had other chronic conditions including

hypertension or a history of cancer."[12] The BOP has reported that of the 30

individuals who died from COVID-19 while in custody, at least 28 had "pre-existing

medical conditions."[13]

"People with moderate to severe asthma may be at higher risk of getting very

sick from COVID-19" because "COVID-19 can affect your respiratory tract (nose,

throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute

respiratory disease."[14] The coronavirus "attacks the edges of the lungs" and "[w]ith

asthma, anything that's foreign or unusual that enters the lungs often triggers an

asthmatic response and causes the airways to narrow further and . . . become

wheezy."[15]

"Like influenza and the common cold, coronavirus can cause an upper

respiratory infection, which can make breathing difficult. That puts those who

---

[12] Aubrey, *Who's Sickest From COVID-19?*

[13] *See* Fed. Bureau of Prisons, *BOP News Stories*
https://www.bop.gov/resources/news_stories.jsp (last visited Apr. 29, 2020).

[14] Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): People with Moderate to Severe Asthma*,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited Apr. 2, 2020); *see also* David Levine, *Coronavirus and Asthma*, U.S. News & World Rep. (Mar. 27, 2020)
https://health.usnews.com/conditions/articles/coronavirus-and-asthma.

[15] Ocbazghi, *How COVID-19 Affects People.*

already have respiratory ailments, such as chronic obstructive pulmonary disease, or COPD, at a higher risk for severe and potentially life-threatening complications."[16]  When COVID-19 "venture[s] deeper into the lungs" the "results [are] pneumonia-like symptoms, requiring hospitalization and sometimes intubation on a ventilator. People who smoke or have chronic lung conditions are especially vulnerable."[17]

Additionally, as a result of his hypertension, Mr. Somerville is also more vulnerable to complications should he contract COVID-19. Indeed, the WHO-China Joint Mission Report provided historical mortality rates for those who contracted COVID-19 with specific pre-existing conditions. For those with hypertension, the mortality rate was 8.4%. That same report indicates that the mortality rate for chronic respiratory disease such as asthma was 8.0%. *Id.*

> **B.** **The presence of COVID-19 within the BOP and at FCI Danbury, a "hotspot" for COVID-19, combined with Tamika Somerville's preexisting medical conditions constitute extraordinary and compelling reasons warranting relief.**

On March 11, 2020, the World Health Organization (WHO) classified COVID-19, a disease caused by the new strain of coronavirus, as a pandemic.[18] On March

---

[16] Levine, *Coronavirus and Asthma.*

[17] Achenbach, *New CDC Data Shows Danger of Coronavirus.*

[18] World Health Organization*, WHO Director-General's Opening Remarks* (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

13, 2020, the President declared the COVID-19 outbreak a national emergency.[19] As of April 29, 2020, COVID-19, has infected over 3 million people, leading to at least 212,049 deaths worldwide.[20] COVID-19 has infected at least 1,012,683 people in the United States – more than any other country – and 53,034 deaths have resulted.[21]

As quick as COVID-19 is spreading across the country, it is spreading through the federal prison system even faster: currently the cumulative rate of rise in COVID-19 cases is nearly twice that of the national cumulative rate of rise.[22] The following charts and graphs starkly illustrate the exponential growth within the BOP:

---

[19] White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (declaring "the COVID-19 outbreak in the United States constitutes a national emergency, beginning March 1, 2020").

[20] *Coronavirus Map: Tracking the Spread of the Outbreak*, N.Y. Times, https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (last visited Apr. 29, 2020) ("*Coronavirus Map*").

[21] *Coronavirus Map.*

[22] *See* Fed. Defenders of New York Southern & Eastern Districts, *BOP COVID-19 Charts and Graphs,* https://federaldefendersny.org/assets/uploads/BOP_COVID-19_Charts_and_Graphs.4.22.pdf (indicating the cumulative BOP rate of rise since March 20, 2020, as of April 25, 2020, is 962.87%, while the national cumulative rate of rise for that period is 510.23%) (last visited Apr. 29, 2020).

**Rate of Rise of Reported COVID-19 Cases in Bureau of Prisons[23] and the United States[24], Every 3 Days**

| Date | Number of BOP Cases | BOP Rate of Rise | Cumulative BOP Rate of Rise Since 3/20/2020 | Number of National Cases | U.S. Rate of Rise | Cumulative U.S. Rate of Rise Since 3/20/2020 |
|---|---|---|---|---|---|---|
| 3/20/2020 | 2 | 0.00% | 0.00% | 18,747 | 0.00% | 0.00% |
| 3/23/2020 | 6 | 200.00% | 200.00% | 44,183 | 135.68% | 135.68% |
| 3/26/2020 | 18 | 200.00% | 400.00% | 85,356 | 93.19% | 228.87% |
| 3/29/2020 | 38 | 111.11% | 511.11% | 140904 | 65.08% | 293.95% |
| 4/1/2020 | 94 | 147.37% | 658.48% | 213144 | 51.27% | 345.21% |
| 4/4/2020 | 174 | 85.11% | 743.59% | 304826 | 43.01% | 388.23% |
| 4/7/2020 | 313 | 79.89% | 823.47% | 395011 | 29.59% | 417.81% |
| 4/10/2020 | 481 | 53.67% | 877.15% | 492,416 | 24.66% | 442.47% |
| 4/13/2020 | 589 | 22.45% | 899.60% | 579,005 | 17.58% | 460.06% |
| 4/16/2020 | 752 | 27.67% | 927.27% | 661,712 | 14.28% | 474.34% |
| 4/19/2020 | 804 | 6.91% | 934.19% | 746,625 | 12.83% | 487.17% |
| 4/22/2020 | 977 | 21.52% | 955.70% | 828,441 | 10.96% | 498.13% |
| 4/25/2020 | 1,047 | 7.16% | 962.87% | 928,619 | 12.09% | 510.23% |

---

[23] Numbers obtained from www.bop.gov/coronavirus on a daily basis. There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases. *Compare* M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, Response to EDNY Administrative Order 2020-14 (Apr. 7, 2020) at https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf (3 positive inmates at MDC Brooklyn) with COVID-19 Cases Federal Bureau of Prisons (Apr. 7, 2020) at www.bop.gov/coronavirus (2 positive inmates at MDC Brooklyn).

[24] Numbers obtained from https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

**Number of Reported COVID-19 Cases in Bureau of Prisons[25]and the United States[26], Compared by Days since First Reported Infection**



**COVID-19 Rate of Infection for Various Populations**



As of April 28, 2020, the BOP reports 30 inmate deaths, and the media (but not the BOP) reports one confirmed staff death. Cassidy McDonald, "Federal prisons confirm first staff death linked to coronavirus," Apr. 18, 2020, *available at*

---

[25] *See* note 23, *supra.*

[26] *See* note 24, *supra.*

https://www.cbsnews.com/news/coronavirus-federal-prisons-confirm-first-staff-death-linked-to-covid-19-robin-grubbs-usp-atlanta/. The BOP also reports that 1,314 inmates and 335 staff have tested positive for COVID-19.[27]  Although the infection rate based on available BOP data is disturbing, "because testing has been grossly insufficient, these numbers are almost certainly an undercount."[28] As the court noted in *United States v. Caddo*, "it is unknowable whether BOP detainees or inmates have Covid-19 until they are tested, and BOP has not conducted many or any such tests because, like the rest of the country, BOP has very few or no actual Covid19 test packets." Order at 5, *United States v. Caddo*, No. 3:18-cr-08341-JJT, ECF No. 174 (D. Ariz. Mar. 23, 2020).

The BOP's flawed response has been widely reported. Walter Pavlo, "Federal Bureau Of Prisons Institutions Not Showing Any Signs Of 'Flattening Curve,'" Forbes, April 15, 2020, https://www.forbes.com/sites/walterpavlo/2020/04/15/federal-bureau-of-prisons-institutions-not-showing-any-signs-of-flattening-curve/#254f0d8454dd. Indeed, in granting preliminary injunctive relief in a class action habeas petition for prisoners at another low security facility, FCI Elkton, the district court found the BOP's actions demonstrated deliberate indifference: "While

---

[27] *See* Fed. Bureau of Prisons, *BOP: COVID-19 Update*, https://www.bop.gov/coronavirus/index.jsp (last visited Apr. 29, 2020).

[28] Lisa Freeland, *et al.*, *We'll See Many More Covid-19 Deaths in Prisons if Barr and Congress Don't Act Now*, Wash. Post (Apr. 6, 2020), https://www.washingtonpost.com/opinions/2020/04/06/covid-19s-threat-prisons-argues-releasing-at-risk-offenders/.

Respondents offer certain prison-practice changes to show they know COVID-19

risks and have sought to reduce those risks, the Court still finds that, at this

preliminary stage of the litigation, the Petitioners have sufficiently met the

threshold for showing that Respondents have been deliberately indifferent." *Wilson*

*v. Williams*, 2020 WL 1940882, *8 (N.D.Ohio,, Apr. 23, 2020). The Court recognized

that despite the BOP's efforts, officials "fight a losing battle. A losing battle for staff.

A losing battle for inmates." *Id.*, 2020 WL 1940882, *1. "With the shockingly

limited available testing and the inability to distance inmates, COVID-19 is going to

continue to spread, not only among the inmate population, but also among the

staff." *Id.*

Other courts have noted the "obvious shortcomings" in the BOP's COVID-19

Action Plan:

> First, testing inside prisons has been scant except for people who self-report
> symptoms—which means that statistics about the number of infections
> already in BOP facilities are largely meaningless. And second, the plan
> provides no additional protections for high-risk individuals." . . . "[E]ven in
> the best run prisons, officials might find it difficult if not impossible to follow
> the CDC's guidelines for preventing the spread of the virus among inmates
> and staff: practicing fastidious hygiene and keeping a distance of at least six
> feet from others."

*United States v. Atkinson*, 2020 WL 1904585, at *3 (D.Nev., 2020) (quoting *United*

*States v. Esparza*, 2020 WL 1696084, at *2 (D. Idaho Apr. 7, 2020) (internal

citations and footnotes omitted)).

A BOP OSHA complaint filed March 31, 2020 by a correctional officers' union

as an "imminent danger report," suggests staff agree with the foregoing assessment

of the BOP's response: "The agency's actions… are proliferating the spread of a

known and deadly contagion both within our prison system and to our surrounding communities….”

**FCI Danbury is a “hotspot for COVID-19.”**

The risk to vulnerable inmates like Tamika Somerville is far from speculative: ***BOP Director Michael Carvajal identifies FCI Danbury, where he is housed, as a “hotspot for COVID-19.”***

https://www.bop.gov/resources/news/20200411_dir_message.jsp

FCI Danbury is located proximate to the New York City metropolitan area, the epicenter of the U.S. COVID-19 outbreak. The Connecticut Department of Public Health (“DPH”) has reported that, as of April 27, 2020, there were 25,269 confirmed cases and 1,924 deaths attributed to COVID-19. Fairfield County, where FCI Danbury is located has the highest number of confirmed cases of COVID-19 and deaths attributed to COVID-19 in the state: as of April 27, 2020, there were 10,529 confirmed cases of COVID-19 and 707 COVID-19 associated deaths.[29]

Tamika Somerville is housed in FCI Danbury's satellite facility (“FSL”).  On April 29, 2020, the BOP reported 17 inmates and 26 staff have tested positive and one inmate has died at FCI Danbury.[30] On April 14, 2020, the facility reported confirmed cases for 37 inmates and 32 staff. The BOP's daily reported numbers do

---

[29] See https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary4232020.pdf?la=en.  See also https://ctmirror.org/2020/04/13/first-incarcerated-person-dies-as-covid-19-spikes-behind-bars/ (noting that as of April 13, 2020, 166 of Connecticut's 11,516 inmates had tested positive for COVID-19, as have 104 staff members).

[30] www.bop.gov/coronavirus/ (last checked Apr. 29, 2020).

not include people who previously tested positive for COVID-19 and have since been deemed recovered by BOP. The BOP provides no explanation as to what qualifies as "recovery."

On April 27, 2020, a class action habeas petition was filed on behalf of individuals housed at FCI Danbury, detailing the grave dangers posed to inmates, staff, and the community by COVID-19 as well as the BOP's failure to implement measures essential to lower the risk of serious illness and death. *Martinez-Brooks v. Easter, Warden of Federal Correctional Institutional at Danbury*, Case No. 3:20-cv-569 Doc. 1 (D.Conn., Apr. 27, 2020). Plaintiffs report that "[t]he incidence rate at Danbury exceeds 2.8% of the total prisoner population at the facility—among the highest concentrations of positive tests per capita of any facility in the Bureau of Prisons network." *Id.*, Case 3:20-cv-569, Doc. 1 at 19.

Tamika Somerville is housed in a single dormitory-style room that accommodates approximately 160-170 beds. The room is divided into cubicles, each containing two bunk beds, separated by approximately four feet. Beds in each cubicle are immediately adjacent to the cubicle wall, which does not reach to the ceiling. In some instances, the wall does not even reach the top of the bunk bed, so women on the top bunk sleep right next to the woman on the top bunk in the adjacent cubicle. All of the women in the FSL share three bathrooms, each of which includes between 4-8 toilets, sinks, and showers. *Id.*, Doc. 1 at 12-13.

The FSL also includes a common area where the women have access to 6-12 shared phones (not all of which are working) and 6 shared computers (only 4 of

21

which are working), which are located in close proximity to one another.

Additionally, the women in the FSL eat meals together in the dormitory. Mealtimes

are not staggered.

According to Declarations included in the habeas action, on Friday April 24,

2020, a woman in Tamika's unit who had been ill began vomiting and struggling for

air. Inmates advocating for her to be treated were told they would get disciplinary

reports if they did not stop. The woman was ultimately taken to the hospital where

she tested positive for COVID-19. The following day, on April 25, roughly 40

inmates who were determined to have recent contact with the sick prisoner,

***including Tamika Somerville,*** were taken from the dormitory and placed

together in a room to await COVID-19 testing. Inmates report that 10 of the 40

tested positive and were moved to a separate area. The remaining 30, including

Tamika Somerville, are quarantined in the kitchen/cafeteria area. Importantly, not

all inmates who had contact with the sick inmate were removed and tested.

Further, all 40 of the women were allowed to return to the dormitory before

beginning the quarantine to gather personal property, use phones and computers,

use bathrooms, and take showers. And even after the women were removed to

isolation, several were able to return to the dormitory to gather snacks and other

belongings. The phones, computers, and bathrooms were not immediately sanitized.

*Martinez-Brooks v. Easter,* Case No. 3:20-cv-00569, Doc. 1 at 21-23; *id*., at Doc. 1-5,

1-6, 1-7 (Declaration of Kimberly Hoisington (reporting that she tested positive and

returned to general population just 7 days later and while she remained unwell)), 1-8.

The kitchen area where Tamika Somerville is now being held has one bathroom for 30 women to share and one phone. There is no computer and there appears to be issues with sending and receiving mail.

It is now well known that the COVID-19 virus is highly infectious and can be spread "easily and sustainably" from person-to-person.[31] The virus can live on plastic and steel surfaces for up to 72 hours, and, powered by a single cough or sneeze, can be propelled in a gas cloud that extends up to 27 feet in length.[32] To date, the virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects, where the virus can survive for up to three days. Critically, people who are asymptomatic or presymptomatic can unknowingly transmit the virus, making it particularly difficult to slow its spread. *See* Martinez-Brooks v. Easter, Case No. 3:20-cv-569, Doc. 1-1 (Declaration of Jaimie Meyer, M.D., ¶20).

The CDC's interim guidance on the management of COVID-19 in the correctional setting recognizes that "[i]ncarcerated/detained persons live, work, eat,

---

[31] *See* Centers for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[32] Neeltje van Doremalen *et al., Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, NEW ENG. J. MED., 2 (2020), *available at* https://doi.org/10.1056/NEJMc2004973; Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions: Potential Implications for Reducing Transmission of COVID-19*, JAMA (2020), https://jamanetwork.com/journals/jama/fullarticle/2763852

study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced." *See* https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf. Moreover, the "ability of incarcerated/detained persons to exercise disease prevention measures" like handwashing and social distancing, may be limited if not impossible. *Id.* "Many facilities restrict access to soap and paper towels and prohibit alcohol-based hand sanitizer and many disinfectants." *Id.* Additionally, incarcerated persons may not report symptoms for fear of isolation. *Id.*

All of this is to say that Mr. Somerville does not have the ability to practice self-care with respect to COVID-19—*i.e.,* he does not have the ability in prison to adequately protect himself from becoming infected with the virus. In the context of the COVID-19 pandemic, courts have recognized that, "[i]n this moment, the inability for high risk individuals to fully self-isolate"—and otherwise follow the CDC's guidelines for preventing the spread of the virus, like practicing painstaking hygiene—"is an inability to provide self-care." *See Esparza*, 2020 WL 1696084, at *3 ("So long as [the defendant] remains in custody, his capacity to protect himself from a serious, or even fatal, infection will be compromised.").[33]

---

[33] *See also, e.g.*, *United States v. Burrill*, ___ F. Supp. 3d ____, 2020 WL 1846788, at *3 (N.D. Ca. Apr. 10, 2020) ("[A]ny incarcerated person with one of these underlying conditions is unlikely to be able 'to provide self-care within the environment of a correctional facility' to avoid contracting COVID-19."); *United States v. Colvin*, 3:19-cr-179, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) ("Defendant is 'unable to provide self-care within the environment of' FDC Philadelphia in light of the ongoing and growing COVID-19 pandemic because she is unable to practice effective social distancing and hygiene to minimize her risk of

In sum, Mr. Somerville's medical vulnerability, the documented presence of COVID-19 among both staff and inmates at FCI Danbury, the BOP's failures, in particular at FCI Danbury, to implement adequate measures to limit spread, are "extraordinary and compelling reasons" warranting a reduction of his sentence.

C.   **This Court should follow those courts that have found extraordinary and compelling reasons warranting relief based on the impact of the global pandemic on vulnerable defendants in BOP custody.**

Since the COVID-19 pandemic, numerous courts around the country have found extraordinary and compelling reasons warranting relief where a defendant presents evidence of a pre-existing-condition (including asthma and hypertension) making him more vulnerable to COVID-19 in combination with the increased risks of COVID-19 in prisons. *See, e.g., United States v. Williams*, 2020 WL 1974372, at *3-4 (D.Conn., Apr. 24, 2020) (reducing sentence to time served where defendant suffered from asthma, hypertension and diabetes, putting him at increased risk from COVID-19, and was unable to properly guard against infection while incarcerated); *United States v. Wen*, 2020 WL 1845104 (W.D.N.Y., Apr. 13, 2020) (defendant's history of asthma along with COVID-19 outbreak at his institution and

---

exposure."); *United States v. Perez*, ___ F. Supp. 3d ____, 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020) ("Confined to a small cell where social distancing is impossible, Perez cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus."); *United States v. Campagna*, 16-cr-78-01, 2020 WL 1489829, at *3 (S.D.N.Y. March 27, 2020) ("Defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify to Defendant's sentence on the grounds that he is suffering from a serious medical condition that substantially diminishes his ability to provide self-care within the environment of the RCC.").

25

that institution's failure to take basic steps to protect against spread of this disease created extraordinary and compelling reasons justifying a reduction in his sentence); *United States v. Norris*, No. 3:18-cr-243, No. 37 (D. Conn., Apr. 16, 2020) (Underhill, C.J.) ("[Defendant] suffers from asthma and uses an Albuterol inhaler to treat his symptoms. . . . [H]is medical condition and current conditions of confinement constitute extraordinary and compelling reasons to reduce his sentence."); *United States v. Hammond*, No. 02294, 2020 WL 1891980, *9 (D.D.C. Apr. 16, 2020) (granting compassionate release to defendant with risk factors because, despite the government's assurance that the "BOP is prepared to deal with pandemics such as the coronavirus . . . 449 inmates and 280 BOP staff members have tested positive for the disease and sixteen inmates have already died"); *United States v  Burrill*, No. 17-cr-491, 2020 WL 1846788, *3 (N.D. Cal. Apr. 10, 2020) ("Prison conditions mean incarcerated individuals, as well as society as a whole, are safer the more defendants are released); *United States v. Mahan*, 1:19-cr-223, 2020 WL 1846789, *4 (D. Id. Apr. 10, 2020) (granting compassionate release where "Defendant has a chronic, moderate asthma condition and such a condition places him at higher risk of getting very sick from COVID-19"); *United States v. Sawicz*, No. 08-cr-287, 2020 WL 1815851, *2 (E.D.N.Y. Apr. 10, 2020) (Ross, J.) (for defendant with hypertension, "the risk of serious illness or death that he faces in prison  constitutes an extraordinary and compelling reason militating in favor of his release").

By finding that Mr. Somerville's medical conditions constitute extraordinary and compelling reasons for a reduction in sentence, this Court will act both in harmony with other district courts across the nation and consistent with Congress' purpose to "increase[e] the use and transparency of compassionate release." First Step Act of 2018, § 603(b), Pub. L. 115-391, 131 Stat. 5194, 5239 (Dec. 21, 2018).

III.   **A Sentence of Time Served Is Sufficient To Accomplish the Goals of Sentencing**.

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i).  Under all of the circumstances in this case and considering the § 3553(a) factors, this Court should conclude that the time that Mr. Somerville has already served is sufficient to satisfy the purposes of sentencing.

Although the crime of conviction was undeniably serious, it is also undeniable that the unlawful possession of the firearm was passive: the gun was in a dresser drawer, and Mr. Somerville immediately alerted law enforcement to its presence. *See* ECF Doc. 61 at 8-9 (noting that the Parole Commission classifies possessing a firearm by a prohibited person as a three on a scale of increasing seriousness from level 1 to level 8, citing 28 C.F.R. § 2.20).  And, as set forth, the ACCA designation was based drug convictions that in fact reflect his addiction; Tamika Somerville is neither the drug kingpin nor the violent felon Congress intended to target and subject to the ACCA's severe punishment.

27

Tamika Somerville has been in federal custody in connection with the present offenses since May 12, 2012, which amounts to approximately 8 years of actual incarceration. After accounting for good conduct time, he has served the equivalent of an approximately 9 years and 1 month sentence. Thus, he has already served a substantial portion of his incarceration sentence, nearly the entire non ACCA-statutory maximum. It is worth noting that the Sentencing Commission's most recently issued report on the effects of prison length on recidivism found that offenders incarcerated for more than 60 months up to 120 months are approximately 17 percent less likely to recidivate. USSC, Length of Incarceration and Recidivism, April, 2020, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2020/20200429_Recidivism-SentLength.pdf?utm_medium=email&utm_source=govdelivery

The BOP lists Tamika Somerville's current release date as March 20, 2025, making his eligible for home confinement (under pre-CARES Act standards) as early as March 20, 2024. Completion of the RDAP program (which has been suspended due to COVID-19) would result in a 12 month reduction, potentially moving release to 2023.

Tamika Somerville's extraordinarily traumatic birth and upbringing has been outlined above. And her exemplary conduct and educational record during her two years in the Allegheny County jail led the sentencing court to predict "she should be a good inmate."  ECF No. 63 at 2. That predication has proven accurate.

Mr. Somerville has been housed a low security facility. He has not had any disciplinary actions at least in at least the last 6 months. Exhibit B. The last disciplinary action appears to have been in 2017 for refusing to obey an order. Exhibit E.  He has maintained a positive employment and educational record. Exhibit B. He has enrolled in barber and office manager apprenticeship programs. Exhibit B.

Outside the prison walls, Mr. Somerville has maintained a strong relationship with his sister. In fact, his sister stands ready to welcome Mr. Somerville to her home. In that regard, Tamika Somerville has provided a verifiable release plan, and his sister's home has sufficient space to allow Tamika to self-quarantine for 14-days. Exhibit D.

In short, having completed an approximately 9 year sentence of incarceration, Tamika Somerville has shown by his conduct that he does not pose a threat to public safety and that granting him compassionate release would not endanger the community.

## VI.   Conclusion

COVID-19 has triggered a pandemic. The virus is highly transmissible, extraordinarily dangerous, and poses a severe threat of death to older individuals and those with underlying illnesses. Mr. Somerville's asthma and hypertension make him vulnerable and constitute "extraordinary and compelling reasons" warranting compassionate release. A sentence of time served to be followed by any necessary term of home confinement is "sufficient but not greater than necessary" to

promote the purposes of sentencing. This Court should grant his request for compassionate release.

Respectfully submitted,

*s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender