UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Crim. No. 2:12-cr-225 |
| | ) | |
| TAMIKA SOMERVILLE | ) | |

**REPLY TO GOVERNMENT'S RESPONSE TO MOTION FOR REDUCTION IN SENTENCE UNDER THE FIRST STEP ACT**

The First Step Act gave district courts an extraordinary tool that can be used to combat the extraordinary threat posed by COVID-19 to medically vulnerable inmates like Tamika Somerville: the authority to reduce an otherwise final term of imprisonment based on its independent assessment of whether "extraordinary and compelling reasons" warrant the reduction. The government opposes any reduction claiming (1) Mr. Somerville failed to give the BOP 30 days to process his request; (2) this Court is constrained by USSG § 1B1.13's policy statement and lacks authority to independently assess whether "extraordinary and compelling reasons" warrant a reduction; (3) the BOP is equal to the task of managing the COVID-19 pandemic within its walls, and (4) a reduction would be inconsistent with the 18 U.S.C. § 3553(a) purposes of sentencing. The government's arguments are either flawed or non-responsive; this Court should grant the reduction.

    **A.**    **There is no need for this Court to address exhaustion.**

Mr. Somerville complied with the statute's 30-day lapse provision. *See* 18 U.S.C. § 3582(c)(1)(A) (prisoner may file a motion either when he has exhausted available administrative remedies *or* after "the lapse of 30 days from the receipt of such a request by the warden" "whichever is earlier"). The government's exhibit reflects that Mr. Somerville submitted a request for sentence reduction to Warden Easter more than 30 days ago, on April 10, 2020. Doc.85-1. There are two forwarding emails dated April 21, 2020, suggesting a staff member

thereafter copied and forwarded the body of Mr. Somerville's April 10 email to a social worker, Rose Adamson, before it ultimately reached the Warden's desk and was denied. Doc. 85-2. The Warden's Declaration—filed in response to the habeas action filed on behalf of a class of vulnerable inmates at FCI Danbury—explains such delay and attributes it to staff, not inmates: "Requests do not reach the Warden's desk[] until 'various staff' at the prison have reviewed the request first." Exhibit E at 25-26 (citing *Martinez-Brooks v. Easter, Warden of FCI Danbury*, No. 3:20-cv-569, Doc.24-2 at 27 (D.Conn.)).

The instant situation is "analogous to the 'prisoner mailbox rule,' which provides that an inmate's papers are deemed filed" when they are given to prison officials for mailing. *United States v. Resnick*, ___ F.3d. ____, 2020 WL 1651508, *6 (S.D.N.Y., Apr. 2. 2020). An inmate can submit an application to a staff member, the warden's representative. "This is typically the only means by which an inmate can communicate with the warden's office. Inmates are not typically handed the keys of the warden's office so they can place their applications…on the warden's desk." *Id*. Thus, the staff member's receipt of the document (here, on April 10) constituted the warden's receipt of that document. *See id*.[1]

---

[1] Apparently reading the records differently, the government would have this Court engage in the meaningless formality of denying the motion and allowing Mr. Somerville to refile once 30 days have passed (and even though the Warden has already denied the request).
   Mr. Somerville maintains that the language, context and history of section 3582 make plain its exhaustion provision is a claims processing rule subject to exceptions (which can and should apply here) and not a jurisdictional requirement. *See United States v. Connell*, No. 3:18-cr-281 (N.D.Cal., May 8, 2020). Notably, Judge Shea called the statutorily mandated process for requesting compassionate release from the Warden at FCI Danbury "the definition of futile." Exhibit E at 48 n.24, 55 (calling the 30-day period "simply dead time"). However, given that even under the government's disputed reading of the record, this Court is authorized to grant the requested reduction not later than May 21, 2010, just days following scheduled argument on the motion, there is no need for this court to reach what is largely an academic question in this case.

2

### B. This Court has authority under the First Step Act to independently determine whether there are "extraordinary and compelling reasons" to reduce an otherwise final sentence on motion of the defendant and without deference to the BOP's denial of such request.

The government contends that the Sentencing Commission defined extraordinary and compelling reasons and, in pertinent part, requires an inmate to be suffering from a terminal illness leaving him incapable of self-care; by failing to satisfy those criteria, it continues, Mr. Somerville fails to demonstrate extraordinary and compelling reasons justifying a reduction. Doc. 85, 11-14 (citing application notes to § 1B1.13). In the government's view, district courts have no authority to add to or alter application note 1(A)'s limited criteria. Tellingly, the Third Circuit authority it cites for that proposition predates the First Step Act. *See* Doc. 85, 16.

Although § 3582(c)(1)(A) requires a sentence reduction to be "consistent with applicable policy statements issued by the Sentencing Commission," in light of the Commission's failure to update its policy statement to account for the First Step Act of 2018's amendments to § 3582(c)(1)(A), "the policy statement is now clearly outdated." *United States v. Rodriguez*, 2020 WL 1627331, at *3 (E.D. Pa., Apr. 1, 2020). Accordingly, while the old "policy statement may provide 'helpful guidance' [it] does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.*; *United States v. Beck*, 425 F.Supp.3d 573 (M.D.N.C.2019). Indeed, a growing consensus of courts hold that following passage of the First Step Act they are no longer bound by the specific categories identified by the Sentencing Commission prior to its enactment; instead, district courts have the authority to reduce a prisoner's sentence upon their own independent finding of extraordinary or

compelling reasons.[2] And numerous courts have held that for inmates like Mr. Somerville with preexisting conditions (like asthma and hypertension) making them more vulnerable to COVID-19, "nothing could be more extraordinary and compelling that this pandemic." *United States v. Pabon*, 2020 WL 2112265 (E.D. Pa., May 4, 2020). *See* Doc. 77 at 24-6 & n.33 (citing cases).[3]

The risk to Mr. Somerville is neither speculative nor exaggerated.

FCI Danbury is experiencing one of the worst active COVID-19 outbreaks in the federal prison system and was one of only three federal prisons specifically identified in Attorney General Barr's April 3, 2020 memo ordering immediate action to place vulnerable inmates on home confinement. Exhibit E at 22, 58. Since the pandemic began, 69 inmates at FCI Danbury have tested positive, out of an inmate population of approximately 1,000; one has died. This "figure may well understate the true number of COVID-19 cases at FCI Danbury, in light of the limited testing that has been conducted." Exhibit E at 7, 13. Twenty of those who tested positive and were found to have active infections are at FCI Danbury's satellite facility, where Mr. Somerville is housed. Exhibit E at 43.

---

[2] *See, e.g., United States v. Marks*, ___ F.Supp.3d___, 2020 WL 1908911, *5 (W.D. N.Y., Apr. 20, 2020) (citing cases); *United States v. Reyes*, 2020 WL 1663129 (N.D. Ill. Apr. 3, 2020); *United States v. Owens*, No. 97-cr-2546, No. 93 at 4 (S.D. Cal. Mar. 20, 2020) ("In the wake of the First Step Act, numerous courts have recognized the court can determine whether extraordinary and compelling reasons exist to modify a sentence—and may do so under the 'catch all' provision similar to that recognized in U.S.S.G. Manual § 1B1.13 n.1(D). . . .") (collecting cases); *United States v. Redd*, 2020 WL 1248493 (E.D. Va., Mar. 16, 2020) (joining other courts concluding that a court may find, independent of the BOP, "that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C)"); *United States v. Young*, 2020 WL 1047815 (M.D.Tenn., Mar. 4, 2020) ("a majority of the district courts that have considered the issue have ... held, based on the First Step Act, that they have the authority to reduce a prisoner's sentence upon the court's independent finding of extraordinary or compelling reasons") (citing cases).

[3] Increasingly, research shows that COVID-19 can cause lasting, long term health issues. *See* Lisa Du, *Virus Survivors Could Suffer Severe Health Effects For Years*, Bloomberg News (May 12, 2020), https://www.bloomberg.com/news/articles/2020-05-12/covid-19-s-health-effects-can-last-long-after-virus-is-gone (last accessed May 13, 2020).

### C. The BOP's underwhelming and failed efforts to control COVID-19 at FCI Danbury.

Although the government contends the BOP is equal to the task of managing the COVID-19 pandemic within its walls and in particular touts its expanded use of home confinement under the CARES Act as the best evidence of this, this contention overlooks the facts on the ground.

On May 12, 2020, the United States District Court in Connecticut issued an order granting a temporary restraining order filed on behalf of medically vulnerable inmates at FCI Danbury, concluding Plaintiffs "have made a preliminary showing that officials at FCI Danbury are making only limited use of their home confinement authority, as well as other tools at their disposal to protect inmates during the outbreak, and that these failures amount to deliberate indifference to a substantial risk of serious harm to inmates in violation of the Eighth Amendment." Exhibit E at 2. In granting the order, the court found petitioners demonstrated a likelihood of success on the merits that they are incarcerated under conditions posing a substantial risk of serious harm: (1) there is a serious outbreak of COVID-19 at FCI Danbury and (2) effective social distancing—the best way to reduce the spread of coronavirus—is impossible there, where the vast majority of inmates at the satellite prison live and sleep in dormitories lined with bunk beds, sharing bathroom and shower facilities. This makes transfer to home confinement (or compassionate release) the only viable measure by which the safety of highly vulnerable inmates can be reasonably assured. Exhibit E at 43-45, 49.

Yet, since March 26, only 159 of the nearly 1,000 inmates at FCI Danbury have been reviewed for home confinement, and only 21 of these have been released. Exhibit E at 22. Significantly, the criteria used to evaluate inmates "evidence a disregard" of the COVID-19 risk factors and at best are "only tangentially related to public safety." Exhibit E at 23-24 (setting forth criteria), 47-49. The court additionally found compassionate release "is a dead end at FCI

Danbury: Of the 241 requests for compassionate release filed since the COVID-19 crisis began, the Warden has signed off on exactly 0." *Id.*, 48 (noting 136 claims have been denied while the remaining are in various stages of processing). The Warden's failure to transfer medically vulnerable prisoners to home confinement "in any meaningful numbers" and her handling of "compassionate release" requests constitutes deliberate indifference. *Id.*, 46-47.

> **D.  Mr. Somerville does not pose a danger to the community and his release is consistent with the § 3553(a) purposes of sentencing.**

The government relies on generalities about guns and drugs and Mr. Somerville's history of drug offenses and ignores the non-violent circumstances of this offense (the passive possession of a firearm found in a dresser drawer).

The ACCA is a blunt instrument, requiring harsh mandatory penalties in cases of mere possession. Although its goal was to target the "most dangerous, frequent and hardened offenders,"[4] it sweeps in individuals like Mr. Somerville without any history of violence (who did not use a firearm in either the instant or prior offenses) treating them as the most dangerous type of repeat offender meriting the harsh minimum. It is now understood that in enacting the ACCA, Congress acted on flawed assumptions: harsh mandatory minimums do not deter[5] and longer sentences lead to increased recidivism after release by making reentry more difficult.[6]

Ms. Somerville's career offender designation likewise is predicated on drug predicates. The Sentencing Commission's 2016 study of individuals sentenced as career offenders based on

---

[4] S. REP. NO. 97-585, at 5 (1982).
[5] Michael Tonry, The Mostly Unintended Effects of Mandatory Penalties: Two Centuries of Consistent Findings, 38 CRIME & JUST. 65, 95 (2009) ("No individual evaluation has demonstrated crime reduction effects attributable to enactment or implementation of a mandatory minimum sentence law."); *see also* Greg Newburn & Sal Nuzzo, James Madison Inst., Mandatory Minimums, Crime, And Drug Abuse: Lessons Learned, Paths Ahead 8-9 (2019).
[6] Rachel Elise Barkow, Prisoners of Politics 89–93 (2019).

6

guidelines that similarly lump together those with prior convictions for crimes of violence and those with prior convictions for drug trafficking, found "clear and notable" recidivism differences between the two groups. Those with only drug-trafficking priors had a lower recidivism rates, and those in the former group were also rearrested for less serious offenses. The Commission concluded based on this evidence that "drug trafficking only offenders generally do not warrant similar (or at times greater) penalties than those career offenders who have committed a violent offense" and urged Congress to amend the law "to more effectively differentiate between career offenders with different types of criminal records."[7]

Empirical evidence shows that drug offenses rarely involve violence.[8] A study of crimes committed in 2010 found that only 1.06% of drug violations involved physical injury to victims.[9]

Congress acted without the benefit of this kind of empirical research, and it instead grouped together people with drug convictions and people with violence in their backgrounds on the basis of erroneous assumptions about the nature of drug trafficking. The First Step Act amended the United States Code to promote the rehabilitation of prisoners and to "**unwind decades of mass incarceration**." *U.S.A. v. Defendant(s)*, 2020 WL 1864906, at *3 (C.D.Cal., Apr. 13, 2020).

Mr. Somerville's lifelong history of trauma cannot be overstated, and that trauma's link to his history of drug offenses is manifest. What is important to note now, however, is Mr. Somerville's successful completion of FCI Danbury's FIT program, a therapeutic community providing an integrated trauma and RDAP program. *See* Exhibit F (counsel can provide additional details at argument).

---

[7] U.S. Sentencing Comm'n, Report to the Congress: Career Offender Sentencing Enhancements 8, 27, 42 fig.21 (2016).
[8] Shima Baradaran, Drugs and Violence, 88 S.Cal. L. Rev. 227, 278–81 (2015).
[9] Evan Tsen Lee *et al.,* Which Felonies Pose a "Serious Potential Risk of Injury" for Federal Sentencing Purposes?, 26 Fed. Sent'g Rep. 118, 119 tbl.1 (2013).

Mr. Somerville has submitted a verifiable release plan that includes stable housing with his sister on Pittsburgh's South Side. (His sister reports that she can provide transportation from the institution to Pittsburgh). Further, he submits that plan should include a home confinement component, substance abuse treatment, trauma focused treatment, and vocational training. Undersigned counsel submits that Mercy Behavioral Health on the Southside offers trauma counseling as well as drug treatment. https://www.pittsburghmercy.org/behavioral-health/pittsburgh-mercy-behavioral-health/. Although vocational training may be suspended due to COVID-19, there are options in Pittsburgh. *See, e.g.*, http://manchesterbidwell.org/career-training/career-training/; https://www.ccac.edu/workforce/workforce-community-training/vocational-education.php. That Mr. Somerville will begin his five year term of supervised release upon his release and so will be monitored by Probation further mitigates any risk. *See United States v. Marks*, 2020 WL 1908911, at *15 (W.D.N.Y., 2020).

In sum, a reduction to time served with some home confinement as a condition of supervised release is warranted considering the foregoing extraordinary and compelling reasons and that (1) Mr. Somerville has served approximately 9 years, 1 month of his sentence including good time, (2) he presents no risk to public safety, (3) he has a viable release plan, and (4) he is subject to five years of supervision. *See United States v. Delgado*, ___ F.Supp.3d.___, 2020 WL 2464685 (D.Conn., Apr. 30, 2020) (granting motion and reducing 10 year sentence for drug conspiracy to time served (just 29-months) in light of COVID-19 pandemic, outbreak at Danbury, and defendant's medical vulnerability).

Respectfully submitted,

*s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender
