## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,    )
                              )
         v.                  )    2:12-CR-225-NR
                              )
TAMIKA SOMERVILLE,        )
                              )
        Defendant.        )

### OPINION

**J. Nicholas Ranjan, United States District Judge**

Tamika Somerville[1] is one of many federal prisoners across the country who have sought compassionate release under 18 U.S.C. § 3582 based on the ongoing public-health crisis related to COVID-19. In many cases, courts have found the risks too speculative or the prisoner too dangerous to justify compassionate release. This case is different.

Mr. Somerville is incarcerated in FCI-Danbury, a prison facing one of the worst outbreaks of COVID-19 in the federal system. What's more, because of his litany of preexisting medical conditions—obesity, hypertension, hyperlipidemia, chronic bronchitis, and asthma—Mr. Somerville is among those who face great risk of serious illness or death if they are ever infected.

That risk is now far from speculative. Indeed, Mr. Somerville has already faced one close call—exposure to an infected prisoner who began vomiting and struggling for air in the middle of his unit. Roughly 40 prisoners, including Mr. Somerville, were determined to have recent contact with the sick prisoner, and 10 of them have since tested positive for COVID-19. The 30 prisoners who tested negative, including Mr. Somerville, were cordoned off in

---

[1] Tamika Somerville is a transgender inmate who was born female but now identifies as male. His counsel indicates that he prefers to be referred to using male pronouns and honorifics, and so the Court does so in this opinion.

a prison cafeteria.  But the risk remains; it is undisputed that social distancing is impossible in the open, dorm-like shared space of the facility where Mr. Somerville resides.  Under these conditions, and because of his medical vulnerability, Mr. Somerville's health and safety cannot be ensured in FCI-Danbury.  This rises to the level of an "extraordinary and compelling reason" to reduce Mr. Somerville's sentence under 18 U.S.C. § 3582(c)(1)(A)(i).

Of course, the Court must weigh these extraordinary circumstances against the ordinary sentencing factors under 18 U.S.C. § 3553(a).  But those factors, too, counsel in favor of compassion.  Indeed, because the original sentencing judge was constrained to impose a 15-year, mandatory-minimum sentence, no court has been permitted to fully factor Mr. Somerville's substantial mitigating characteristics into his sentence.  These include his horrendous upbringing.  Mr. Somerville was, in fact, born in prison, and his childhood progressively worsened from there.  The sentencing judge, who had served almost 40 years on the bench, described his upbringing as "the most pathetic childhood and early adulthood that I have ever seen."  Other mitigating factors include the non-violent, low-level nature of the drug-dealing offenses that resulted in his criminal history being overstated.  And his record of good behavior and self-improvement while in prison also favor release.

In short, while Mr. Somerville's crime was serious, that seriousness has been fully reflected in the eight years he has already served in prison.  That is particularly so since the Court intends to convert the remaining five years of his prison sentence to a three-year period of probation with home confinement.  Given the imminent risk that Mr. Somerville will become seriously ill or die if he remains in prison, the Court finds that a modified sentence along these lines complies with the statutory goals of imposing a just sentence here.

Mr. Somerville was born in prison. He shouldn't die there. His motion will be granted.

## BACKGROUND

Mr. Somerville is currently serving a sentence of 180 months' imprisonment after pleading guilty to (1) Possession of a Firearm by a Convicted Felon, 18 U.S.C. § 922(g)(1); and (2) Possession with Intent to Distribute Heroin, 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C). [ECF 63]. This term of imprisonment will be followed by a five-year term of supervised release. *Id.*

Having completed more than eight years of his sentence, Mr. Somerville now moves under 18 U.S.C. § 3582(c)(1)(A)(i) for a reduction of his prison sentence to time-served, or a term of home confinement, based on his underlying medical conditions and the risk of exposure to COVID-19 at FCI-Danbury. [ECF 77; ECF 82; ECF 86; ECF 89; ECF 90]. The government opposes Mr. Somerville's release. [ECF 85]. Both parties agreed that the Court can decide the motion on the papers, except that Mr. Somerville requested oral argument, which the Court held on May 18, 2020. [ECF 81].

Given the urgency of Mr. Somerville's motion, and because the Court writes for the benefit of the parties who are presumably familiar with the pertinent background facts, the Court will dispense with any comprehensive summary of the facts and only reference the facts necessary to its decision as they become relevant to the analysis below.

## DISCUSSION & ANALYSIS

A court usually "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). But there are "a few narrow exceptions" to this general "rule of finality." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One is the compassionate-release statute, 18 U.S.C. § 3582(c)(1)(A), which allows a court to "reduce" a term of imprisonment if it finds that (1)

"extraordinary and compelling reasons" warrant reduction; (2) the reduction is "consistent with any applicable policy statements issued by the Sentencing Commission," and (3) consideration of the ordinary sentencing factors under 18 U.S.C. § 3553(a) favors reduction.

Until last year, only the Bureau of Prisons ("BOP") could file motions for compassionate release, and it "rarely did so." *United States v. Rodriguez*, ___ F. Supp. 3d ___, No. 03-271, 2020 WL 1627331, at *2 (E.D. Pa. Apr. 1, 2020). Indeed, "[f]rom 1984 to 2013, an average of only 24 inmates were released each year through BOP-filed motions." *Id.* (citation omitted). According to a report by the Department of Justice's Inspector General, these low numbers resulted from a combination of poor management, inconsistent implementation, a lack of clear standards, and the resultant "varied and inconsistent understandings of the circumstances that warrant consideration for compassionate release." *Id.* (citation omitted).

Unsatisfied with the compassionate-release program, Congress acted. In late 2018, it passed the First Step Act—a "landmark piece of criminal-justice reform legislation that amended numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration." *Id.* (cleaned up); *see also United States v. Brooks,* No. 07-20047, 2020 WL 2509107, at *4 (C.D. Ill. May 15, 2020) ("The First Step was passed against the backdrop of a documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants."). Of relevance here, § 603(b) of the First Step Act, which Congress titled "Increasing the Use and Transparency of Compassionate Release," amended § 3582(c)(1)(A) to allow prisoners to bring compassionate-release motions directly to court—so long as they first ask the BOP to file a motion on their behalf and then either exhaust the BOP's administrative appeal process or wait 30 days, whichever comes

- 4 -

first.  *See* 18 U.S.C. § 3582(c)(1); First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 (2018).

With this legislative backdrop, and amid an "unprecedented pandemic" that has "paralyzed the entire world," the Court now confronts Mr. Somerville's pending motion.  *Rodriguez*, 2020 WL 1627331, at *1.  For the following reasons, the Court finds that Mr. Somerville has exhausted his administrative remedies and that a reduction of his sentence to a three-year term of probation and home confinement, to be followed by the originally imposed five-year term of supervised release, is appropriate.

## I.   Mr. Somerville has exhausted his administrative remedies.

Section 3582(c)(1)(A) permits a prisoner to bring a compassionate-release motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  18 USC § 3582(c)(1)(A).  In other words, the prisoner "must at least ask the [BOP] to [file a compassionate-release motion] on their behalf and give BOP thirty days to respond."  *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020); *see* 18 U.S.C. § 3582(c)(1)(A).  The Third Circuit has cautioned that strict compliance with this requirement "takes on added—and critical—importance" in light of the "ongoing COVID-19 pandemic."  *Raia*, 954 F.3d at 597.

Mr. Somerville made his request to the Warden on April 10, 2020,[2] and the Warden issued a summary denial on April 23, 2020.  Mr. Somerville did

---

[2] The government argues that Mr. Somerville's request was not made until April 21, 2020–the date when it reached the Warden.  Though it makes no practical difference here, the 30-day period is properly calculated from the date Mr. Somerville submitted his release request to prison staff, rather than the date it was physically placed on the Warden's desk or forwarded to the

not administratively appeal the Warden's decision, and instead, on April 29, 2020, filed his motion for release before the Court.

The government argues that Mr. Somerville hasn't exhausted his remedies because he didn't fully exhaust his remedies through the BOP appeal process, and he didn't wait until 30 days after the Warden's decision before filing his motion, instead filing 19 days after.

The Court held oral argument on the motion on May 18, 2020, and during the oral argument both parties appeared to agree that the issue is moot since, by anyone's count, more than 30 days have now elapsed since the Warden's "receipt" of Mr. Somerville's request and the BOP has not filed a compassionate-release motion on his behalf. *See* [ECF 92 at 32:8-11] ("I know the defense argues that the receipt was before April 21st. I think either way we are very close to 30 days, so I don't see the fact that the defendant did not appeal is particularly significant."); *cf. United States v. Mel*, No. 18-0571, 2020 WL 2041674, at *1 (D. Md. Apr. 28, 2020) ("As the parties agreed during the April 27, 2020 status conference, where a 30-day period following the receipt

---

Warden's email inbox. "The statute does not say, 30 days, plus an additional 2.5 weeks until the form is formally accepted by the warden's office." *United States v. Resnick*, No. 14-810, 2020 WL 1651508, at *6 (S.D.N.Y. Apr. 2, 2020). No other rule makes much sense in this time-sensitive context, as "[i]nmates are not typically handed the keys of the warden's office so they can place their applications for compassionate release on the warden's desk." *Id.* Thus, the Court agrees with Mr. Somerville that the ordinary "prisoner mailbox rule" should apply to motions under § 3582(c)(1)(A), and that Mr. Somerville's submission of a release request to prison staff—the Warden's representatives—on April 10, 2020 triggered the 30-day exhaustion period. *See United States v. Bess*, No. 16-156, 2020 WL 1940809, at *2 (W.D.N.Y. Apr. 22, 2020) ("The Court therefore … applies the analogous prisoner mailbox rule to find that the request was received on the date it was submitted.").

of Mel's request ended on April 23, 2020, Mel has now satisfied the statutory exhaustion requirement.").

Nonetheless, to avoid any doubt and to follow the Third Circuit's directive regarding how "critical" the BOP's input is into these decisions, the Court issued an order after oral argument holding Mr. Somerville's motion in abeyance until after May 26, 2020. [ECF 88]. The purpose of this order was to provide the BOP an additional opportunity, if it so desired, to "more fully assess" Mr. Somerville's request for compassionate release and "if appropriate, reconsider its denial" of that request—particularly in light of *Martinez-Brooks v. Easter*, No. 20-569, 2020 WL 2405350 (D. Conn. May 12, 2020), a recent decision in a *habeas* class action against FCI-Danbury. [ECF 88, pp. 2-3]. Despite this, no further responses or orders from the Warden related to Mr. Somerville's request have been brought to the Court's attention. Now, clearly, more than 30 days have passed since the Warden's initial receipt of Mr. Somerville's request, and the Warden has had two opportunities to consider that request. As such, the Court finds that the 30-day "back stop" of § 3582(c)(1)(A) has been met, and the Court may consider the motion on the merits.

But there is one more matter on exhaustion—an issue that neither party briefed but which the Court believes is necessary to address. Recall that § 3582(c)(1)(A) permits a prisoner to bring a compassionate-release motion: (1) "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" **or** (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"

Some courts have read into this second prong of the statute that the prisoner may seek judicial relief after "the lapse of 30 days from the receipt of

such a request by the warden of the defendant's facility" only **if the warden hasn't responded**.  Under this view, the 30-day waiting period only applies if the Warden stays silent.  If instead the Warden, as here, has issued a written summary denial, then some courts have held that the inmate must proceed through a full appeal process within the BOP and must fully exhaust that process before being able to file in court.  *See, e.g. United States v. Nance*, No. 92-135, 2020 WL 114195, at *2 (W.D. Va. Jan. 10, 2020) ("[C]ases indicate that this statutory exhaustion requirement has been interpreted to excuse full exhaustion of administrative remedies only if 30 days have elapsed without any response by the Bureau of Prisons to the inmate's request."); *United States v. Bevans-Silva*, No. 416-352, 2020 WL 2475079, at *1 (S.D. Ga. May 13, 2020).

Respectfully, the Court finds that reading to be unmoored from the statutory text, as have others.  *See United States v. Haney*, No. 19-541, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020).[3]  Indeed, § 3582 expressly *does not* "require the moving defendant to fully litigate his claim before the agency (i.e., the BOP) before bringing his petition to court."  *Id.*  "Rather, it requires the defendant **either** to exhaust administrative remedies **or** simply to wait 30 days after serving his petition on the warden of his facility before filing a motion in court."  *Id.* (emphasis added).  These are two, *alternative* ways that a prisoner can "exhaust" his remedies with the BOP before seeking judicial relief, and he may seek relief after "whichever is earlier."  Nothing in the statutory

---

[3] *Haney* also holds that the exhaustion requirement under § 3582 is waivable under certain circumstances. *Haney*, 2020 WL 1821988, at *4.  After *Raia*, 954 F.3d at 595, that is unlikely the law in the Third Circuit.  However, to be clear, the Court does not *waive* the 30-day requirement here—it has been more than 30 days since Mr. Somerville requested release.  Rather the Court merely declines to impose *additional* requirements to access the 30-day "fast-track" for judicial relief that are found nowhere in the statute.

text limits the 30-day, fast-track option to circumstances in which the Warden has failed to respond—the clock runs from the Warden's "receipt" of the request. And nothing requires the prisoner to appeal a denial from the Warden if more than 30 days has elapsed. The Court declines to read additional requirements into the statute that aren't there.[4]

In addition to being compelled by the text, this reading is more consistent with Congress's clear intent in passing the First Step Act. When it amended § 3582(c)(1)(A), Congress sought to give prisoners "a right to a prompt and meaningful judicial determination of whether [they] should be compassionately released[.]" *United States v. Russo*, No. 16-441, 2020 WL 1862294, at *6 (S.D.N.Y. Apr. 14, 2020). The text of amended § 3582(c)(1)(A) reflects congressional determination not to let "exigencies interfere with the right of a defendant to be heard in court on his motion for compassionate

---

[4] At least one of the courts that read the statute differently nevertheless conceded that this was the "literal reading." *Nance*, 2020 WL 114195, at *2. The Supreme Court has instructed that where a statute is unambiguous, a court must interpret the statute by its literal terms, unless it is one of the rare and extraordinary cases where doing so would thwart the purpose of the statute. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982) ("There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Nevertheless, in rare cases the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling. We have reserved some scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would thwart the obvious purpose of the statute. This, however, is not the exceptional case.") (cleaned up). Here, there is nothing to suggest that interpreting the statute by its plain and literal terms would thwart Congress's intent or any obvious purpose of the statute. To the contrary, the practical concerns relied on by the court in *Nance* (and others) to read the statute to say something other than what it does are, in fact, a feature of the First Step Act, not a bug.

release, and hence only ***limited him*** to 30 days before he could come to court in the ordinary course." *Haney*, 2020 WL 1821988, at *3 (emphasis added).

Consider too that the First Step Act was designed, in part, to address release motions by inmates suffering from terminal illness. Congress's clearly expressed intent was for those inmates to exhaust their requests with the BOP, but to a point—*i.e.*, 30 days—and for the BOP to act quickly. As other courts have found, "Congress's central goal in amending this statute" was "to correct a compassionate-release system so plagued by delay that prisoners sometimes died while waiting for the BOP to make a decision." *Rodriguez*, 2020 WL 1627331 at *5. Indeed, the Third Circuit too has, at least implicitly, viewed the exhaustion provisions of § 3582(c)(1)(A) to proceed with speed. *See Raia*, 954 F.3d at 597 (noting that "we anticipate that the statutory requirement will be speedily dispatched").

Simply put, 30 days is the *cap* on how long the BOP must be given to handle things administratively before judicial involvement is permissible. And once 30 days has passed, the statute "allows a defendant to come to court before the agency has rendered a final decision." *Id*.; *see also United States v. Vence-Small*, No. 18-31, 2020 WL 1921590, at *5 (D. Conn. Apr. 20, 2020) ("All that the text of the 30-day waiting time requirement suggests is that Congress understood that some requests for relief may be too urgent to be delayed beyond 30 days. Congress could have chosen fewer days than 30 days. It could have chosen no days at all. Congress chose 30 days. And the statute fully empowers the BOP to file a motion on a defendant's behalf at any time before the 30 days elapse.").

On a whole, § 3582(c)(1)(A) is best read as Congress balancing the importance of requiring inmates to proceed through the BOP internal process so that the BOP can exercise its professional expertise in handling inmate

requests for relief, but putting the BOP on a 30-day clock before an inmate has the option of seeking judicial relief.

For these reasons, the Court holds as the statute says: Mr. Somerville may seek judicial relief after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," regardless of what the Warden might have done after that "receipt." As of now, it has been 49 days since Mr. Somerville submitted his release request to prison staff on April 10, 2020, 39 days since Mr. Somerville's request physically reached the Warden's desk on April 21, 2020, and 37 days since the Warden denied his request on April 23, 2020. [ECF 85-1; ECF 85-2]. The BOP has not filed any motion for compassionate relief on his behalf. By any reasonable measure, the 30-day exhaustion requirement is now satisfied (and then some).[5]

---

[5] The parties dispute the nature of § 3582(c)(1)(A)'s exhaustion requirement. The government argues that it is jurisdictional, while Mr. Somerville argues that it is a claims-processing requirement. The Court finds that it is more akin to a claims-processing requirement. Substantively, that distinction doesn't really matter here. Whether jurisdictional or not, it is clearly a mandatory requirement, as made clear by the Third Circuit in *Raia*. The Court only notes this because if § 3582(c)(1)(A) is a claim-processing requirement, that affects how the issue is treated in the course of litigation. For example, exhaustion can be an argument that the government can waive if not raised. And, as noted above, the government did not raise the argument that the 30-day back stop only applies when the Warden remains silent. *See United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015) ("The most likely situation in which the jurisdictional line would make a difference would be a case where a district court granted relief under § 3582(c)(2) and the government asserted on appeal an apparently winning argument it had not made in the district court. If the issue were truly jurisdictional, it could not be waived.").

## II.   The Court is permitted to decide whether "extraordinary and compelling reasons" exist to reduce Mr. Somerville's sentence.

The government next argues that, in deciding whether "extraordinary and compelling reasons" exist, the Court is constrained by a policy statement issued by the Sentencing Commission before Congress enacted the First Step Act.  [ECF 85, pp. 11-14]; U.S.S.G. § 1B1.13 cmt. n.1(A)-(C).  That statement "lists three specific examples of 'extraordinary and compelling reasons,'" none of which apply to Mr. Somerville, and also "a fourth 'catch-all' provision" that, on its face, applies only if the "Director of the Bureau of Prisons" determines that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described." *Rodriguez*, 2020 WL 1627331, at *2.  The government's position is that, despite the First Step Act, the policy statement still applies, and so only the BOP has "catch-all" authority to decide if "extraordinary and compelling reasons" exist outside the narrow, enumerated categories under subdivisions (A) – (C), while courts are limited to the enumerated categories.  The Court rejects this view.

It is true that § 3582(c)(1)(A) requires that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission."  But the key word is "applicable."  The Commission has not updated its policy statement to account for the First Step Act and it is now "clearly outdated*." Rodriguez*, 2020 WL 1627331, at *3-4.  As a result, a growing consensus of courts across the country have concluded that, after the First Step Act, the Commission's policy statement "does not constrain a court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A)." *Id.* at *3-4; *see, e.g. United States v. Pabon*, No. 17-165, 2020 WL 2112265, at *2 (E.D. Pa. May 4, 2020); *United States v. Etzel*, No. 17-01, 2020 WL 2096423, at *3 (D. Or. May

1, 2020); *United States v. Norris*, No. 19-36, 2020 WL 2110640, at *2 (E.D.N.C. Apr. 30, 2020); *United States v. Marks*, No. 03-6033, 2020 WL 1908911, at *5 (W.D.N.Y. Apr. 20, 2020).[6]

The Court finds this authority persuasive.  In particular, the Court agrees that the Commission's limitation of "catch-all" subdivision (D) to determinations made by the BOP, rather than by the court, is clearly a "relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act." *Young*, 2020 WL 1047815, at *6; *see also Fox*, 2019 WL 3046086, at *3 ("That deference to the BOP no longer makes sense now that the First Step Act has reduced the BOP's role.").  Indeed, that "prefatory language, which requires a determination by the BOP Director, is… part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance." *Redd*, 2020 WL 1248493, at *7.

If the policy statement remains relevant at all after the First Step Act, the more natural interpretation is that the Court at least "assumes the same discretion as the BOP Director [under the 'catch-all' provision] when it considers a compassionate release motion properly before it." *Brown*, 411 F. Supp. 3d at 451. Anything less "would essentially nullify the [catch-all]

---

[6] *See also, e.g.*, *United States v. Reyes*, No. 04-970, 2020 WL 1663129, at *4 (N.D. Ill. Apr. 3, 2020); *United States v. Redd*, No. 97-06, 2020 WL 1248493, at *6 (E.D. Va. Mar. 16, 2020); *United States v. Young*, No. 00-02, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020); *United States v. Maumau*, No. 08-758, 2020 WL 806121, at *2 (D. Utah Feb. 18, 2020); *United States v. Rivernider*, No. 10-222, 2020 WL 597393, at *3 (D. Conn. Feb. 7, 2020);*United States v. Ebbers*, No. 02-1144, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020); *United States v. Schmitt*, No. 12-4076, 2020 WL 96904, at *3 (N.D. Iowa Jan. 8, 2020); *United States v. Cantu*, 423 F. Supp. 3d 345, 352 (S.D. Tex. 2019); *United States v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. 2019); *United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019); *United States v. Fox*, No. 14-03, 2019 WL 3046086, at *3 (D. Me. July 11, 2019).

- 13 -

category as to motions brought by defendants [as authorized by the First Step Act], since the director's failure to bring a motion presumably means that the director does not believe that any extraordinary and compelling reason exists." *Marks*, 2020 WL 1908911, at *5.

That result would be "antithetical to the First Step Act." *Rodriguez*, 2020 WL 1627331 at *5. By amending § 3582(c)(1)(A), Congress sought to correct "a compassionate-release system so plagued by delay that prisoners sometimes died while waiting for the BOP to make a decision." *Id.* "It would be a strange remedy indeed if Congress provided that prisoners whose wardens failed to respond [to a request for release] could only take advantage of the thirty-day lapse provision by accepting a pared-down standard of review that omitted the flexible catchall standard." *Id.* It would also have "the perverse effect of *penalizing* prisoners who take advantage of the First Step Act's fast-track procedures and rewarding prisoners who endure the BOP-related delay that the Act sought to alleviate." *Id.* (emphasis original).

Thus, as a threshold matter, the Court finds that it has the authority to independently assess whether there are "extraordinary and compelling reasons" to reduce Mr. Somerville's sentence here. *Rodriguez*, 2020 WL 1627331 at *3-4; *see also Pabon*, 2020 WL 2112265, at *2.

### III. The Court finds that there are "extraordinary and compelling reasons" to reduce Mr. Somerville's sentence.

Turning to the crux of Mr. Somerville's motion, the Court finds that he has established "extraordinary and compelling reasons" to justify compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). The appropriate analysis begins with the text of the statute, which does not "define—or place any limits on—what 'extraordinary and compelling reasons' might warrant [a] reduction." *Crowe v. United States*, 430 F. App'x 484, 485 (6th Cir. 2011). As

a result, the Court will "give the phrase its ordinary meaning." *FCC v. AT & T Inc.*, 562 U.S. 397, 403 (2011).

The word "extraordinary" is commonly understood to mean "going beyond what is usual, regular, or customary," or "exceptional to a very marked extent." *Extraordinary*, Merriam-Webster Dictionary (2020); *see also Extraordinary*, Black's Law Dictionary (11th ed. 2019) ("Beyond what is usual, customary, regular, or common."). The word "compelling" means "forceful," "demanding attention," or "convincing." *Compelling*, Merriam-Webster Dictionary (2020); *see also Compelling Need*, Black's Law Dictionary (11th ed. 2019) ("A need so great that irreparable harm or injustice would result if it is not met."). Thus, at a minimum, § 3582(c)(1)(A)(i) requires a justification for release that is both ***unusual*** (*i.e.*, unique to the inmate, and beyond the ordinary hardship of prison) and ***significant*** (*i.e.*, serious enough to make release appropriate).

In the context of the current global pandemic, "[c]ourts around the country have granted compassionate release where the defendant suffers from a serious condition that increases the likelihood of severe consequences from COVID-19." *Brooks*, 2020 WL 2509107, at *5.[7]  Most, though not all, of the cases where compassionate release has been granted also involved some

---

[7] *See, e.g. United States v. Delgado*, No. 18-17, 2020 WL 2464685, at *3 (D. Conn. Apr. 30, 2020) ("Since the outbreak of the COVID-19 pandemic, numerous courts within this Circuit have held that a defendant's pre-existing health conditions … in combination with the increased risks of COVID-19 in prisons constitute 'extraordinary and compelling reasons' warranting relief."); *United States v. Sedge*, No. 16-537, 2020 WL 2475071, at *3 (E.D.N.Y. May 13, 2020); *United States v. Bess*, No. 16-156, 2020 WL 1940809, at *8 (W.D.N.Y. Apr. 22, 2020); *United States v. Tran*, No. 08-197, 2020 WL 1820520, at *1 (C.D. Cal. Apr. 10, 2020); *United States v. Lee*, No. 19-419, 2020 WL 2512415, at *2 (N.D. Cal. May 15, 2020).

showing that COVID-19 is actually present, usually to a significant degree, in the facility where the prisoner is incarcerated.  *See, e.g.*, *United States v. Gorai*, No. 18-220, 2020 WL 1975372, at *2 (D. Nev. Apr. 24, 2020) ("To make matters worse, defendant notes that '[o]n April 16, 2020, the count at Lompoc USP, now leading the BOP in inflicted inmates and staff, had 69 inmates and 22 staff testing positive.' …  Even those numbers may be underrepresentative because only inmates with symptoms are tested."); *United States v. Cassidy*, No. 17-116, 2020 WL 2465078, at *7 (W.D.N.Y. May 13, 2020) ("Here, however, Cassidy demonstrates more than just a general possibility that he could contract COVID-19. … He demonstrates incarceration in a proven 'hotbed' facility that has numerous positive cases, including inmates with whom Cassidy has shared quarters.").

At the same time, courts have most often denied motions for compassionate release where prisoners articulate only generalized or speculative fear about the risk of infection, without any showing of serious medical vulnerability or uncontrolled exposure risk in the prison where they are held.  *See, e.g., United States v. Canada*, No. 119-014, 2020 WL 2449344, at *1 (S.D. Ga. May 12, 2020) ("[W]ithout sufficient and concrete evidence to demonstrate that Canada's individual circumstances justify compassionate release because of the COVID-19 pandemic, the Court would deny Canada's motion on the merits as well."); *Brooks*, 2020 WL 2509107, at *5 ("This Court has previously stated 'the mere presence of COVID-19 in a particular prison cannot justify compassionate release—if it could, every inmate in that prison could obtain release.'"); *United States v. Gagne*, No. 18-242, 2020 WL 1640152, at *5 (D. Conn. Apr. 2, 2020) (denying compassionate release to defendant whose underlying condition was unexplained "tingling in her right hand").

While the Third Circuit has not articulated a definitive standard to be applied to § 3582(c) motions in this context, it has observed generally that the mere "existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner[.]" *United States v. Roeder*, No. 20-1682, 2020 WL 1545872, at *3 n.16 (3d Cir. Apr. 1, 2020). From that, the Court infers that a prisoner seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held. Mr. Somerville has made that showing here.

### A. Mr. Somerville's medical conditions place him at high-risk of serious illness or death if infected.

To begin with, Mr. Somerville has established that he suffers from medical conditions that make him uniquely susceptible to serious illness or death if infected by COVID-19. Mr. Somerville is 41 years old, and therefore not in a high-risk age group. But his medical records reflect a significant history of hypertension, hyperlipidemia, chronic bronchitis, and asthma. *See generally* [ECF 89]. And at 5'8" and more than 220 lbs, Mr. Somerville has a BMI that qualifies him as being "obese." [ECF 77-3]. He currently takes medication for his hypertension and asthma, and he carries an Albuterol inhaler. [ECF 89].

Mr. Somerville's medical records reflect that he was hospitalized due to asthma in 1997 and identify still-active "triggers" for his asthma, such as "hot/humid weather" (which, of course, is fast approaching). [*Id.* at p. 52]. As one example, Mr. Somerville sought medical attention while in prison because he was "short of breath." [*Id.* at p. 7]. Along with his motion, Mr. Somerville

has submitted a letter from Dr. Amesh Adalja—a board-certified physician and infectious-disease specialist treating coronavirus patients in Pittsburgh—who reviewed Mr. Somerville's records.  [ECF 90-1].  In his letter, Dr. Adalja opines that Mr. Somerville falls within a "high-risk group for complications" and recommends that he be "released to the community to reduce his chances of contracting the virus."  [*Id.*].

Collectively, this evidence is enough to satisfy the Court that Mr. Somerville does indeed face a heightened risk of serious illness or death if infected with COVID-19.  [*Id.* at p. 1].  In fact, hypertension and obesity have proven to be "the most common comorbidities" associated with increased risk of infection, grave illness, and death due to COVID-19. *Pabon*, 2020 WL 2112265, at *4 (citations omitted); *see also United States v. Pena*, No. 15-551, 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) ("This Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension, like Mr. Pena."); *United States v. Etzel*, No. 17-01, 2020 WL 2096423, at *4 (D. Or. May 1, 2020) ("It is well documented that these underlying issues, particularly hypertension and coronary diseases are associated with increased risk of infection and worse outcomes in lung injury and mortality.").  Recent data from the New York State Department of Health reflects this—of 23,564 total fatalities in that State, 12,678 (54%) had hypertension, 4,940 (21%) had hyperlipidemia, and 2,170 (10%) had COPD (which includes chronic bronchitis).[8]  Mr. Somerville has all three.

---

[8] New York State Department of Health, *NYSDOH COVID-19 Tracker* (last visited May 27, 2020), *available at* https://covid19tracker.health.ny.gov/.

The CDC also identifies individuals with "chronic lung disease or moderate to severe asthma" as "high-risk for severe illness from COVID-19."[9] That Mr. Somerville has been hospitalized due to his asthma at least once in his life and actively carries an inhaler suggests that condition is something more than minor.   [ECF 89, pp. 28, 49, 53, 62, 106].   What's more, "[h]ypertension and obesity may synergize with [] asthma giving a lower physiologic reserve to withstand infection." [*Adalja Ltr.*, ECF 90-1 at p. 1].

Of course, "[i]n the absence of a deadly pandemic that is deadlier to those with [Mr. Somerville's] underlying conditions, these conditions would not constitute 'extraordinary and compelling reasons'" to release him. *Pabon*, 2020 WL 2112265, at *4.   But the "deadly pandemic" is here.   And the Court is persuaded that the "confluence of COVID-19 and [Mr. Somerville's] health conditions … makes this circumstance extraordinary and compelling," at least when, as discussed below, coupled with a showing of sufficiently non-speculative risk of infection at FCI-Danbury. *Id.*

### B.   Mr. Somerville faces a serious and present risk of exposure to COVID-19 at FCI-Danbury.

To that point, Mr. Somerville has also established that he faces a serious risk of exposure to COVID-19 if he remains in FCI-Danbury.   Even under normal circumstances, "[p]risons are tinderboxes for infectious disease." *Rodriguez*, 2020 WL 1627331, at *1; *see also United States v. Park*, No. 16-473, 2020 WL 1970603, at *2 (S.D.N.Y. Apr. 24, 2020) ("[S]ome medical professionals have warned that the highly infectious nature of COVID-19 in

---

[9] Centers for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness* (last visited May 27, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html .

conjunction with a prison environment could amount to a ticking time bomb."). And the well-documented conditions at FCI-Danbury are far from normal.

As many district courts have now recognized, FCI-Danbury "has become a hotbed of COVID-19" in the federal prison system. *United States v. Valencia*, No. 15-163, 2020 WL 2319323, at *7 (S.D.N.Y. May 11, 2020); *see also Cassidy*, 2020 WL 2465078, at *6 ("[T]here have been difficult-to-control 'hotspots.' FCI Danbury is one of them."); *Mel*, 2020 WL 2041674, at *2 ("Although the presence of the historic COVID-19 pandemic in prisons arguably could alone establish extraordinary and compelling reasons, Mel has been incarcerated at FCI-Danbury, one of the hardest hit federal prisons."); *Martinez-Brooks*, 2020 WL 2405350, at *20 ("It is undisputed that there is an active and serious outbreak of COVID-19 at FCI Danbury."). Indeed, just over a month ago, Attorney General Barr singled out FCI-Danbury as one of three BOP facilities experiencing "significant levels of infection" and requiring emergency action to "move vulnerable inmates out of these institutions." *See* Office of the Attorney General, *Memorandum for Director of Bureau of Prisons: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020), *available at* https://www.justice.gov/file/126661/download.

Inside FCI-Danbury's "satellite prison" for women, where Mr. Somerville is incarcerated, social distancing is indisputably impossible. *See Martinez-Brooks*, 2020 WL 2405350, at *23 ("The Warden does not dispute the impossibility of instituting effective social distancing measures [at FCI-Danbury] ... where the vast majority of the population lives and sleeps in large dormitory halls lined with bunk beds, sharing bathroom and shower facilities."). In the facility, Mr. Somerville is housed with approximately 131 other inmates in a "single dormitory-style room ... divided into cubicles, each containing two bunk beds, separated by approximately four feet[.]" *Id.* at *4.

In some instances, the wall between cubicles does not reach the top of the bunk beds, and inmates on the top bunks sleep "next to the woman on the top bunk in the adjacent cubicle." *Id.* All 131 prisoners share three bathrooms, each with only 4-8 toilets, sinks, and showers. *Id.*

Mr. Somerville's fear that he will be exposed to COVID-19 in these conditions is much more than speculative. The *known* rate of infection in the satellite prison is much higher than in the community—20 of 143 prisoners present at the time testing was conducted in the satellite prison, after intervention by a United States Senator. *Id.* at *20. As of just a few weeks ago, 49 other inmates have since tested positive. *Id.* This number almost certainly "underrepresent[s]" the *actual* number of positive cases at the prison due to "significant questions" about "the adequacy of testing." *Id.*

Mr. Somerville has already experienced one close call. On April 24, 2020, a prisoner began vomiting and struggling for air in the middle of his unit. [ECF 77, p. 22]. That prisoner was ultimately taken to a hospital, where she tested positive for COVID-19. [*Id.*]. Roughly 40 inmates, including Mr. Somerville, were determined to have recent contact with the sick prisoner and quarantined together to await testing. [*Id.*]. Ten of the 40 inmates subsequently tested positive and were moved to a separate area. [*Id.*]. The remaining 30, including Mr. Somerville, were purportedly "quarantined" together in a prison cafeteria. [*Id.*]; *see also Martinez-Brooks,* 2020 WL 2405350, at *6 (describing the same incident).

Making matters worse, the federal judge overseeing a parallel *habeas* class-action against FCI-Danbury, currently pending in the District of Connecticut, recently issued a temporary restraining order against the prison. *See Martinez-Brooks*, 2020 WL 2405350, at *32 (Shea, J.). There, Judge Shea found that the Warden of FCI-Danbury was likely failing to protect vulnerable

inmates through home confinement or compassionate release, and neither "implementing Section 3582(c)(1)(A) in the way Congress intended when it adopted the First Step Act," nor making "any noticeable effort to update the process for evaluating 'compassionate release' requests to take account of the COVID-19 pandemic." *Id.* at *24. As a result, he concluded that the prison was likely violating the Eighth Amendment rights of its medically vulnerable prisoners. *Id.* ("For the medically vulnerable inmates at FCI Danbury, this failure bolsters my conclusion that Petitioners have shown a likelihood of success on the merits on their claim that the Respondents are displaying deliberate indifference in violation of the Eighth Amendment.").

This Court does not have the benefit of the fully developed record that is (or will be) before Judge Shea. But for purposes of this motion, it is enough that the Court can neither ensure Mr. Somerville's continued health and safety in FCI-Danbury under current circumstances, nor be confident that the Warden will independently take adequate measures to protect Mr. Somerville if the Court were to defer to the BOP.

The Court's concern is certainly not allayed by the Warden's summary denial of Mr. Somerville's request for release, which reflects the very same deficiencies identified by the court in *Martinez-Brooks*. [ECF 85-2]; *see Martinez-Brooks*, 2020 WL 2405350, at *26 ("All of these circumstances support the order I issue today, which requires the Warden … to explain why, apparently, no consideration is being given in this process to the serious risk of illness or death posed to the medically vulnerable subclass.").

The one-page denial letter sent to Mr. Somerville makes no mention of his medical conditions and instead appears to apply the outdated and restrictive standard that Congress sought to change with the First Step Act— a standard that, in effect, categorically bars compassionate release except in a

narrow sliver of cases involving terminal illness, advanced age, or the need to care for a child or family member.  [ECF 85-2, p. 1] ("[Y]our concern about being potentially exposed to, or possibly contracting, COVID-19 does not currently warrant an early release from your sentence.").

In the Court's view, the letter reflects no "individualized" balancing of "severity of the risk faced by the inmate from COVID-19 in light of [his] age and medical history, the danger the inmate presents to the residents of the home environment under consideration, and the danger to the public at large." *Martinez-Brooks*, 2020 WL 2405350, at *26.  Nor does it reflect any consideration of other possible steps to protect Mr. Somerville, such as use of the BOP's temporary-release authority under 18 U.S.C. § 3622.  *See Park*, 2020 WL 1970603, at *5 ("[T]he mechanism for granting temporary release – 18 U.S.C. § 3622(a) – lies solely in the BOP's hands, leaving the Court without any authority to grant the relief it believes most proper in this instance.").  In a post-First Step Act and post-pandemic world, this rote denial doesn't inspire confidence that Mr. Somerville's circumstances are being addressed.

Given that, it is no surprise that that FCI-Danbury "has, to date, not granted a single request for compassionate release—a batting average that is dramatically less favorable to inmates than the frequency with which courts … are granting [§] 3582 motions." *Martinez-Brooks*, 2020 WL 2405350, at *25.  Moreover, despite the Court holding Mr. Somerville's motion in abeyance to provide the Warden an opportunity to reconsider or more fully explain that denial, she has not done so.

For these reasons, the Court finds that the combination of Mr. Somerville's medical vulnerability, the urgent conditions in FCI-Danbury, and the Warden's response to the outbreak there provides an "extraordinary and compelling reason" to reduce his sentence under § 3582(c)(1)(A)(i).  In reaching

that conclusion, the Court joins many other district courts that have released medically vulnerable inmates from FCI-Danbury in light of the worsening outbreak there. *See, e.g., Delgado*, 2020 WL 2464685; *United States v. Sawicz*, No. 08-287, 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020); *United States v. Foreman*, No. 19-62, 2020 WL 2315908 (D. Conn. May 11, 2020); *Sedge*, 2020 WL 2475071; *Valencia*, 2020 WL 2319323; *Park*, 2020 WL 1970603; *Mel*, 2020 WL 2041674.

## IV.   The Court finds that a reduction to Mr. Somerville's sentence is consistent with the sentencing factors under § 3553(a).

That said, the Court's finding of "extraordinary and compelling reasons" does not automatically justify a reduction in Mr. Somerville's sentence or compassionate release. The Court must first weigh the extraordinary reasons for releasing Mr. Somerville against the ordinary sentencing factors under 18 U.S.C. § 3553(a) "to the extent that they are applicable." 18 U.S.C. § 3582(c)(1). Here, consideration of those factors confirms the Court's decision to reduce Mr. Somerville's sentence.

### A.   The Sentence Reduction.

At the time of his original sentencing, Mr. Somerville was subject to a 15-year mandatory-minimum sentence under the Armed Career Criminal Act. The sentence he received was the shortest that the sentencing court could impose—his personal history and characteristics could not reduce it any further. *See United States v. Coleman,* No. 09-175, 2010 WL 582678, at *9 (N.D. Ohio Feb. 10, 2010) ("The ACCA does not permit the court to consider personal circumstances in its sentencing analysis."); *United States v. Mosley*, 339 F. App'x 568, 576 (6th Cir. 2009) ("Defendant next argues that the trial court should have considered his personal circumstances in its sentencing analysis, but the ACCA requires only that the district court find that defendant was

convicted of being a felon in possession of a firearm and that he has three prior convictions for a violent felony or a serious drug offense, or both."); *United States v. Walls*, 407 F. App'x 996 (8th Cir. 2011) ("[H]aving properly determined that Walls was an armed career criminal, the district court had no discretion to sentence him below the statutory minimum."); *United States v. Fields*, No. 10-081, 2015 WL 7273314, at *4 (E.D. Pa. Nov. 18, 2015) ("Because under 18 U.S.C. § 924(e), a mandatory minimum sentence of fifteen years applies to armed career criminals, this Court had no discretion to reduce Defendant's sentence below fifteen years[.]").

In the context of a compassionate-release motion, however, the Court is permitted to consider whether the § 3553(a) factors warrant a lower sentence, even if the original sentencing judge could not. *See Bess*, 2020 WL 1940809, at *11 ("This Court finds no indication in the text of section 3582(c)(1)(A) that courts are limited to offering compassionate release only to those inmates who have satisfied their statutory-minimum terms of incarceration."); *see, e.g., Rodriguez*, 2020 WL 1627331, at *12 (releasing defendant 17 years into 20-year mandatory-minimum sentence and considering personal characteristics, including that "Mr. Rodriguez's extensive criminal history is mostly composed of low-level drug dealing" and "[t]he predicate offenses to his mandatory minimum sentences were non-violent."); *Schmitt*, 2020 WL 96904, at *6 ("In considering the Section 3553(a) factors, I note that if Judge O'Brien would have been able to grant Schmitt a lower sentence, he almost certainly would have.").

Based on those factors, and in light of the "extraordinary and compelling" circumstances discussed above, the Court will reduce Mr. Somerville's sentence, by converting the remaining five years of imprisonment into three years (36 months) of probation with home confinement. *Cf. United States v. Norris*, No. 19-36, 2020 WL 2110640, at *3 (E.D.N.C. Apr. 30, 2020) (replacing

"remaining term of imprisonment" with term of "probation" subject to "home detention"). That term of probation will be subject to the applicable mandatory and standard conditions listed in U.S.S.G. § 5B1.3. The Court will further impose special conditions of 36 months of home detention and, at the discretion of the Probation Office, location monitoring, as specified in U.S.S.G. § 5F1.2. Because this constitutes a reduction in Mr. Somerville's sentence, no in-person sentencing hearing is required. *See* Fed. R. Crim. P. 43 ("A defendant need not be present under any of the following circumstances: ... The proceeding involves the correction or reduction of sentence under ... 18 U.S.C. § 3582(c)."); *see also United States v. Hadden,* 112 F. App'x 907, 908 (4th Cir. 2004) ("[A] defendant does not have the right to be present if the 'proceeding involves the correction or reduction of sentence under ... 18 U.S.C. § 3582(c).'").

**B.    The § 3553(a) Factors.**

In fashioning the modified sentence that it imposes, the Court has carefully considered all of the sentencing factors under 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A), and weighed them as follows:

**i.    § 3553(a)(1) – The nature and circumstances of the offense and the history and characteristics of the defendant.**

There is no doubt that Mr. Somerville was convicted of a serious crime that warranted a serious sentence. He illegally possessed a gun, with a laser-sight no less, despite multiple past felony convictions. [ECF 56, p. 4]. And he possessed a quantity of heroin with the intent of selling it. [*Id.* at pp. 4-5]. By its order today, the Court does not intend to in any way minimize the severity, or dangerousness, of those offenses. And the severity of Mr. Somerville's misconduct certainly weighs somewhat against any reduction in sentence.

That said, Mr. Somerville's sentence was harsh. He has already spent the better part of a decade behind bars for a crime that, while serious, did not involve violence. His criminal history, though significant, also involves no apparent violence and only low-level drug dealing—mostly occurring in his early-to-mid-twenties. [*Id.* at pp. 8-11]. Mr. Somerville is now 41 years old. The Court is mindful that almost *all* federal prisoners have committed serious crimes. If generalized (albeit legitimate) concerns about the dangers of guns and drugs were enough to bar to compassionate release, almost no one would be eligible. And other courts have released prisoners convicted of far more heinous crimes than Mr. Somerville in the midst of this pandemic. *See, e.g., United States v. McCarthy*, No. 17-0230, 2020 WL 1698732, at *1 (D. Conn. Apr. 8, 2020) (releasing prisoner convicted of "armed bank robbery"); *Delgado*, 2020 WL 2464685, at *1 (releasing prisoner convicted of "conspiracy to distribute …five kilograms or more of cocaine"); *Tran*, 2020 WL 1820520, at *1 (releasing prisoner convicted of conspiracy to commit Hobbs Act robbery and "possession of a machine gun.").

As discussed above, the harshness of Mr. Somerville's sentence here did not result from any individualized consideration of his background and characteristics by the sentencing judge (aside from his criminal record). Rather, he was subject to a 15-year mandatory-minimum sentence, which did not "permit the court to consider personal circumstances in its sentencing analysis." *Coleman,* 2010 WL 582678, at *9.

Consideration of Mr. Somerville's history and characteristics beyond his criminal record would, in the Court's view, have justified a substantial downward variance if not for the mandatory-minimum roadblock. Indeed, the circumstances of Mr. Somerville's life are such that the sentencing judge (then-Senior District Judge Maurice B. Cohill, with nearly 40 years of experience on

the federal bench) was moved to note, in his Judgment Order, that Mr. Somerville had "the most pathetic childhood and early adulthood that I have ever seen." [ECF 63, p. 2].

The Court concurs with that assessment. As reflected in the Final Presentence Report, Mr. Somerville has been surrounded by drugs and death from an early age. He was born in the Pennsylvania State Correctional Institute (SCI) at Muncy, where his mother gave birth while incarcerated. [ECF 56, ¶ 45]. Two weeks after he was born, Mr. Somerville was taken from his mother and sent to live with his grandmother—a recovering heroin addict—in the Hill District section of Pittsburgh until his mother's release. [*Id*.]. His father died of bone cancer when he was just three years old. [*Id*.].

After his mother was released from prison, Mr. Somerville returned to live with her for approximately four years before she was re-incarcerated. [*Id*. at ¶¶ 45-46]. During this time, his mother was addicted to heroin and often left him at home unsupervised, sometimes without food. [*Id*. at ¶ 46]. When his mother eventually returned to prison, Mr. Somerville was sent to live with his paternal aunt in Pittsburgh's North Side and then back to his grandmother in the Hill District. [*Id*. at ¶ 45]. Around age ten, Mr. Somerville moved to Cleveland with his grandmother. [*Id*.]. He then returned to Pittsburgh as a teenager. [*Id*.].

Mr. Somerville began smoking marijuana at age 12, and his marijuana use eventually escalated to smoking multiple times per day, every day. [*Id*. at ¶ 56]. As a teenager, Mr. Somerville was diagnosed with bipolar disorder and prescribed psychiatric medication. [*Id*. at ¶ 54]. When he was 14, his best friend was stabbed to death in front of him. [*Id*. at ¶ 55]. His stepsister's father, whom Mr. Somerville identified as a positive male role-model, was murdered during a home invasion in 2010. [*Id*. at ¶ 47].

Unsurprisingly, Mr. Somerville's drug addiction escalated in his early adulthood. Between age 21 and 26, Mr. Somerville began abusing ecstasy and Vicodin. [*Id.* at ¶ 56]. In 2011, he experienced an allergic reaction to Vicodin and so turned to Percocet, which he abused until his arrest in 2012. [*Id.*]. When pills were unavailable, he abused heroin. [ECF 59, p. 12; ECF 60, pp. 6-7]. The entirety of Mr. Somerville's prior criminal history (until this offense) took place when he was between ages 21 and 25. [ECF 63, pp. 8-11].

Certainly, Mr. Somerville's tragic upbringing and history of substance abuse do not excuse the serious crimes he has committed. But they do help to explain him, and they weigh in favor of compassion now. *See Boyde v. California*, 494 U.S. 370, 382 (1990) (recognizing the "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.").

ii.    **§ 3553(a)(2) – The need for the sentence imposed. . .**

Under § 3553(a)(2), the Court considers whether the sentence imposed reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords sufficient deterrence, protects the public, and provides the defendant with needed educational and vocational and other treatment. The Court's reduced sentence furthers these goals.

As discussed, Mr. Somerville's crime was serious, and a serious sentence was appropriate to reflect that fact, deter future criminal conduct, protect the public, and provide Mr. Somerville with rehabilitation such as education or vocational training. Here, as discussed above, the Court finds that the severity of Mr. Somerville's crime has been adequately reflected in the eight years he has already served in prison.

Additionally, while rehabilitation alone cannot form a basis for compassionate release, 28 U.S.C. § 994(t), in determining the need for Mr. Somerville's remaining sentence, the Court is permitted to consider Mr. Somerville's rehabilitation during the considerable time he has spent in prison since his arrest. *See, e.g., Rodriguez*, 2020 WL 1627331, at *10 ("Mr. Rodriguez's rehabilitation alone would not constitute an extraordinary and compelling reason. But the qualifier 'alone' implies that rehabilitation can contribute to extraordinary and compelling reasons. That is how the Commission has understood the statute."); *Brown*, 411 F. Supp. 3d at 449 ("[T]he Commission implies that rehabilitation may be considered with other factors."). By all accounts, Mr. Somerville's record in prison has been positive.

Of note, even prior to his sentencing, the Deputy Warden of the Allegheny County Jail took the unusual step of writing a letter to Judge Cohill to report that Mr. Somerville had been a "model inmate" who had "proven [him]self in a position of trust" as a pod worker and "demonstrated a considerable degree of respect for the staff members of the institution and fellow inmates alike." [ECF 77-4, p. 1]. The Deputy Warden further noted that, during his two-year stay at the jail, Mr. Somerville had "not had any disciplinary action taken against [him] and [he] has never refused an assigned task." [*Id.*].

Separately, an instructor at the Allegheny County Jail also wrote a letter to Judge Cohill reporting Mr. Somerville's "exemplary behavior" and treatment of others with "utmost respect and courtesy." [*Id.* at p. 2]. She praised him as a "keenly intelligent, realistic, and truthful" student with "dedication, drive, and [] willingness to learn." [*Id.*] At sentencing, Judge Cohill remarked that Mr. Somerville had "done so well at the jail and in the courses that [he's] taken

and in [his] behavior … that I think [he's] got a good chance of making it on the outside when [he] does come out." [ECF 72, pp. 17-18].

While in federal custody, Mr. Somerville has continued to actively participate in psychological and drug-treatment programs. [ECF 77-3; ECF 89]. His prison medical records demonstrate that he has made significant progress toward reaching his treatment goals and demonstrated increased self-awareness. Moreover, the record reflects that Mr. Somerville has completed numerous prison-sponsored education, job training, and treatment programs just since 2015, including, most recently, completion of "small business" and "culinary arts" classes. [ECF 77-3]. He is currently enrolled in "barber" and "office manager" apprenticeship programs. Mr. Somerville is housed in a low-security facility; he has not had any disciplinary violations in at least the past 6 months. [*Id.*].

Based on these considerations, the Court finds that Mr. Somerville's post-sentence rehabilitation weighs in favor of a reduced sentence. Mr. Somerville's positive record in prison suggests that the rehabilitative aims of his sentence have already been accomplished to the extent practicable and ameliorates against any concern the Court might otherwise have for protecting the public from further crimes by Mr. Somerville.

### iii.   § 3553(a)(3) – The kinds of sentences available.

The Sentencing Guidelines provide that "[h]ome detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment." U.S.S.G. § 5F1.2. The "kind of sentence" the Court intends to impose is consistent with this guideline.

Mr. Somerville urges the Court to reduce his sentence to time served. But in the Court's view, that sentence would not sufficiently account for the seriousness of his offense. Instead, converting roughly the remainder of his

prison time to a period of probation with home confinement is appropriate and the kind of sentence that is available under the Guidelines.

> ### iv.    § 3553(a)(4), (a)(6) – The kinds of sentences and sentencing range established for Mr. Somerville's crime, and the need to avoid unwarranted sentencing disparities among similar defendants.

The Court acknowledges the government's legitimate concern that sentencing disparities would result from releasing Mr. Somerville with significant time remaining on his sentence.   [ECF 85, p. 23].   For several reasons, however, that concern is not ultimately significant here.

First, even if true, that cannot alone be dispositive in this context.  A categorical or even near-categorical bar on granting compassionate release to inmates who have not served a particular percentage of their sentence fails to appreciate the extraordinary danger that COVID-19 poses to medically vulnerable inmates.   Mr. Somerville's sentence, however harsh, "did not include incurring a great and unforeseen risk of severe illness or death." *Rodriguez*, 2020 WL 1627331, at *12.

Second, the "discount" Mr. Somerville will receive as a result of the Court's decision is not as great as the government fears.  To begin with, Mr. Somerville has served a substantial portion (approximately 60%) of his total sentence and could have been eligible for release to home confinement by 2023 or 2024, even if his official release date is not until 2025.  *Cf. Bess*, 2020 WL 1940809, at *1 ("Bess has been incarcerated, most recently under the authority of the [BOP] … for approximately 41 months and, crediting 'good time,' has served roughly 60% of his sentence.").   Moreover, while the Court is modifying Mr. Somerville's sentence to a term of probation, he will be under strict home confinement and subject to his original, five-year term of supervised release thereafter.  Even under this new sentence, Mr. Somerville has a long way to

go before he will be permitted to fully re-integrate into society, and he will be subject to this Court's supervision until that time.

Third, some disparity is unavoidable here *regardless* of whether the Court grants or denies Mr. Somerville's motion. Numerous district courts have granted compassionate release to high-risk inmates with similar, and in some cases greater, time remaining on their sentence due to the current pandemic. *See, e.g., Delgado*, 2020 WL 2464685 (releasing inmate with 8+ years remaining); *Brooks*, 2020 WL 2509107 (releasing inmate with 7 years remaining); *Bess*, 2020 WL 1940809 (releasing inmate with 3.5 years remaining on sentence and 2.5 years remaining until projected release); *United States v. Echevarria*, No. 17-44, 2020 WL 2113604 (D. Conn. May 4, 2020) (releasing inmate with 3+ years remaining); *United States v. Muniz*, No. 09-0199, 2020 WL 1540325 (S.D. Tex. Mar. 30, 2020) (releasing inmate with approximately 3 years remaining); *Pabon*, 2020 WL 2112265 (releasing inmate with 2.5 years left on sentence and 2 years until projected release); *Park*, 2020 WL 1970603 (releasing inmate with 20 months remaining); *Rodriguez*, 2020 WL 1627331 (releasing inmate with 1.5 years remaining).

The world is in the midst a public-health crisis of unprecedented magnitude. And the determination of whether a prisoner should be released is inherently individualized and fact-specific. Courts all over the country are trying their best, but some disparities in judgment are inevitable—and already quite evident in the case law. If the Court grants Mr. Somerville's motion, he may be treated more favorably than some "similarly situated" prisoners. On the other hand, if the Court denies Mr. Somerville's motion, he will just as likely be treated less favorably than many others. The principle of "avoiding disparity" cuts both ways—not always in favor of a longer sentence.

Ultimately, the modified sentence the Court intends to impose seeks to minimize disparity in both directions.[10]

> ### v.    § 3553(a)(5) – Any pertinent policy statement.

The parties have not brought any pertinent Sentencing Commission policy statement to the Court's attention, and the Court is not aware of any (aside from the Commission's policy statement related to compassionate release, discussed above).  Accordingly, this factor does not apply.

> ### vi.    § 3553(a)(7) – The need to provide restitution to any victims of the offense.

This factor also does not apply here, as the government agrees that "restitution is not applicable in this case." [ECF 85, p.23].

On balance, then, the Court finds that the § 3553(a) factors support the modified sentence it imposes here.  Under these extraordinary circumstances, the eight years Mr. Somerville has served in prison (plus the additional years of probation/home confinement and supervised release) are sufficient but not greater than necessary to account for the crimes to which he pled guilty.

---

[10] Without diminishing the seriousness of Mr. Somerville's crimes, for purposes of evaluating sentencing disparity, the Court finds it relevant that his is not the "classic" case of an "armed career criminal."  To be sure, his criminal history is significant.  He was not a law-abiding citizen in his youth.  But that history consists exclusively of street-level drug sales and, until the instant offense, no weapons charges.  His arrest was carried out by the City of Pittsburgh police.  Had his case not happened to catch the attention of the United States Attorney (who adopted the state-court case), it would have been handled on the county level and, like thousands of other prisoners charged with equivalent state crimes, his sentence would have been far shorter than what he received.  While courts must do what they can to avoid disparity, the often-dramatic effects of random chance cannot be wholly purged from the law.

## **CONCLUSION**

For all the reasons discussed above, Mr. Somerville's remaining term of imprisonment will be modified to a three-year (36 months) term of probation, subject to the applicable mandatory and standard conditions listed in U.S.S.G. § 5B1.3, as well as special conditions of 36 months of home detention and, at the discretion of the Probation Office, location monitoring, as specified in U.S.S.G. § 5F1.2. Mr. Somerville's term of probation and home confinement will be followed by the originally imposed five-year term of supervised release.

An appropriate order will follow, detailing the terms of Mr. Somerville's modified sentence and appropriate release procedures, which will include a 14-day quarantine period at FCI-Danbury, or another facility selected by the BOP, to commence immediately. During that time, the BOP and the Probation Office shall make any necessary arrangements to allow Mr. Somerville's release to proceed. The Court also tentatively approves Mr. Somerville's proposed release plan, subject to further review and comment by the Probation Office during the quarantine period.

DATED this 29th day of May, 2020.

BY THE COURT:

*/s/ J. Nicholas Ranjan*
United States District Judge